B. B. Margolis and Iris M. Margolis v. Commissioner.Margolis v. CommissionerDocket Nos. 85706, 88082.United States Tax CourtT.C. Memo 1962-86; 1962 Tax Ct. Memo LEXIS 222; 21 T.C.M. (CCH) 444; T.C.M. (RIA) 62086; April 19, 1962Harrison Harkins, Esq., for the petitioners. Marion Malone, Esq., for the respondent. RAUMMemorandum Findings of Fact and Opinion The respondent determined the following deficiencies in income tax of the petitioners: YearAmount1955$76,991.93195651,505.15195714,932.11195853,738.47Some of the issues raised in the pleadings have been settled by stipulation and some have been abandoned by petitioners. The remaining issues are: 1. Were the gains realized by petitioner in the U.S. Holding Company and Sachs exchanges in 1955 and from the Lillian Levikow exchange in 1957 recognizable for tax purposes, and, if so, were they taxable as ordinary income or long term capital gains? 2. Were the gains realized by petitioner in connection with transactions involving Trusts R-13316, R-14066, 2018, S-275, 432, 473 and 482 taxable as ordinary income or as long term capital gains? 3. Did the respondent err in disallowing $1,200 of the deduction claimed by petitioner for travel and entertainment expenses in his*224 returns for each of the years 1955, 1956 and 1957? Findings of Fact Some of the facts have been stipulated, and, as stipulated, they are incorporated herein by reference. Petitioners, husband and wife, are residents of San Diego, California. They filed joint income tax returns for the years 1955, 1956, 1957 and 1958 with the district director of internal revenue for the Los Angeles, California, internal revenue district. At all times material herein B. B. Margolis (hereinafter referred to as petitioner) was in the real estate and insurance business. His reported income from business and capital gains during the taxable years was as follows: 1955195619571958Real estate commissions$ 11,751.34$ 18,563.93$20,747.03$ 21,880.10Insurance commissions4,762.843,086.905,175.945,278.17Profit on sale of real estate4,507.013,603.837,028.96750.00$ 21,021.19$ 25,254.66$32,951.93$ 27,908.27Expenses41,759.2034,518.7436,652.0234,322.28Loss($ 20,738.01)($ 9,264.08)($ 3,700.09)($ 6,414.01)Net capital gains$119,108.71$102,832.14$33,160.87$122,769.50Petitioner has maintained his business office*225 at 6575 El Cajon Boulevard, San Diego, since 1945. His present staff consists of an office manager and a part-time stenographer. In the past he also employed a full-time bookkeeper, but not recently. He employs no salesmen, and the only salesman he ever had was a retired army sergeant who was employed for a few years after World War II. He never gave any instructions to his bookkeeper as to how or in what account his properties should be entered on his books. Petitioner's business career began with the Title Insurance and Trust Company in Los Angeles where he was employed from 1921 to 1926. During the last two or three years of that employment he handled 30 or 40 active subdivision trusts and his duties involved the drawing of contracts and deeds, collections, policies of title insurance and all matters pertaining to the trusts. From 1926 to 1932 petitioner was employed in the San Diego area for one of the persons whose trust he had been handling at the Title Insurance and Trust Company. From 1932 to 1936 he did general real estate work. Beginning in 1936 he became interested and active in rehabilitating distressed properties and subdivisions in the San Diego area. In the course*226 of this work he acquired ownership or ownership interests in the following subdivisions: (a) Rolando Units 1 through 5; 881 lots (later cut up to make around 950 lots). Ownership interests: Petitioner 60%; Joseph Levikow and H. P. Arthur, 40%. (b) Windsor Hills, 232 lots. Ownership interests: Petitioner 50%; T. B. Young, 50%. (c) Silver Strand Beach Gardens, 398 lots. Wholly owned by petitioner. From 1936 until he entered the Marine Corps in 1942, petitioner was engaged in the sale of lots in these subdivisions. He was in military service from 1942 through "a good part of" 1945. In the period after World War II petitioner developed and sold four subdivisions: Rolando Park, 421 lots; South Bay Terrace, 173 lots; Vista La Mesa Villas, 94 lots; and Country Club Manor, 101 lots. He owned a 50 percent interest in South Bay Terrace, and a 25 percent interest in Vista La Mesa Villas. With the exception of South Bay Terrace, out of which some lots were sold, the lots in the post-war subdivisions were improved with houses and the completed houses and lots were sold. In terms of zoning or land use, there were three classes of lots in the pre-war and post-war subdivisions: Most of*227 the lots were zoned R-1 for single family residence; a few were residential income lots, for the construction of multiple residential rental units (duplex, four-family rental, etc.); and some of the lots were C-zone, or commercial lots, that could be used for commercial income producing purposes. Petitioner and his associates did not offer for sale all of the lots in the subdivisions. They retained some lots because they were either commercial or desirable "view" lots. Upon the termination of the subdivision projects, they apportioned among themselves the retained lots, and, whenever possible, petitioner arranged to take commercial lots. Of the 17 rental properties now owned by petitioner, all but two were developed on lots retained from past subdivision projects. The lots retained by petitioner and his associates from the subdivisions, and not sold by them, were salable at the time. Four of the lots thus retained by him (together with 10 other lots) were involved in the U.S. Holding Company, Sachs and Levikow exchanges hereinafter mentioned. These four lots were as follows: Date Ex-LotBlockClassificationTractDate Acquiredchanged421ResidentialRolando No. 33- 9-39 - 60%1-553- 7-51 - 40%1812ResidentialRolando No. 212-28-42 (reac-quired 3-8-56)9-5526CResidentialWindsor Hills1- 6-451-5595CommercialSouth Bay Terrace8-16-461-55*228 U.S. Holding Company Exchange: In September of 1955, petitioners consummated an exchange with U.S. Holding Company of San Diego, California, in the course of which they transferred $26,000 in cash and four lots located in San Diego County in exchange solely for three and a fraction lots, improved with an 8-room residence. Petitioners realized a gain of $17,450.33 on the exchange. They did not include this amount in the taxable income reported in their 1955 income tax return. Respondent determined it was taxable as ordinary income. The four lots transferred by petitioners to U.S. Holding Company in the September, 1955 exchange were the following: Date Ac-PeriodLotquiredHeldLot 18, Block 12, RolandoNo. 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 3/4 yearsLots 4 (except N.W. 20feet), 5, and 6, Block216, Middletown5-14-4015 1/3 years Each of these lots had been carried on petitioner's books since the dates of their acquisition in Account No. 124 entitled "Real Estate Held for Sale." The Rolando lot was a vacant residential lot retained by petitioner from the Rolando subdivision. The Middletown lots were vacant residential lots acquired by petitioner on May 14, 1940, through*229 the foreclosure of improvement bonds. They were close to the city, had good "views," and could have been rezoned as residential income property. There were no buildings on the Middletown lots, and those sold in 1955 represented one-half of the Middletown lots acquired by petitioner in 1940. The other one-half of these lots was sold by petitioner prior to 1955. The four lots transferred by petitioner to the U.S. Holding Company were held by him primarily for sale to customers in the ordinary course of his business. The property received by petitioners in the September, 1955 U.S. Holding Company exchange was acquired for their residence and they still occupy it as such. In the year following the 1955 exchange with U.S. Holding Company, petitioner reacquired from U.S. Holding Company Lot 18, Block 12, Rolando Unit No. 2, at a cost of $3,532.04, in return for cash and Lot 9, Block 4, South Bay Terrace, a commercial lot. Sachs Exchange: In January of 1955, petitioner consummated an exchange with John M. Sachs, in the course of which petitioner transferred $1,847.70 cash and seven lots, located in San Diego County, in exchange solely for real property located in San Diego County. *230 Petitioner realized a gain of $16,490.19 in the exchange. He did not include this amount in the taxable income reported in his 1955 income tax return. Respondent determined it was taxable as ordinary income. The seven lots transferred by petitioner to Sachs in the January, 1955 exchange were the following: PeriodLotDate acquiredHeldLot 9, Block 5, SouthBay Terrace8-16-468 1/3 yrs.Lot 4, Block 21, RolandoNo. 360% - 3- 9-3915 5/6 yrs.40% - 3- 7-513 5/6 yrs.Lot 25, Block C, Wind-sor Hills1- 6-4510 yrs.Lot 25, Block C, Wind-sor Hills10-31-504 1/4 yrs.Lots 127, 128, and southhalf of 129, El Prado12-19-3816 yrs. These lots were held by petitioner primarily for sale to customers in the ordinary course of his trade or business. The first three lots listed above were lots retained from subdivisions in which petitioner participated, and of the three the South Bay Terrace lot was a commercial lot, while the Rolando lot and the Windsor Hills lot were residential. The history of the remaining lots is as follows: (a) Lot 25, Block C, Windsor Hills, adjoined Lot 26 (owned by petitioner). It was a desirable "view" property*231 which overlooked a good part of San Diego County and part of the ocean and Mexico. (b) Lots 127, 128 and the south half of 129, El Prado, were large potential industrial or manufacturing lots which backed on a railroad. Petitioner had retained the lots transferred in the Sachs exchange because they were either industrial, commercial, or desirable "view" lots. Lot 9, Block 5, South Bay Terrace, a vacant lot from which petitioner received no income, was carried on his books in Account No. 124 entitled "real estate held for sale" from its acquisition date in 1946 until March 31, 1952, when it was transferred to Account 158 entitled "real estate held for investment." The other six lots involved in the Sachs exchange were continuously carried on petitioner's books in Account 124 entitled "real estate held for sale." The real property acquired by petitioner in the Sachs exchange was a portion of Lot 7, Lemon Villa, San Diego County. This property was then a vacant lot zoned for commercial use, and it adjoined a shopping center (Boulevard Mart) in which petitioner owned a stock interest. Subsequent to the acquisition of the Lemon Villa property, one-half of it has been improved with*232 a building, under lease, and the other half has been leased for parking purposes to a tenant of the shopping center. Petitioner still owns the property. Levikow Exchange: In August of 1957, petitioner consummated an exchange with Lillian Levikow in the course of which petitioner transferred $3,275 cash and four lots, located in San Diego County, in exchange solely for commercial zone real property located in San Diego County. Petitioner realized a gain of $3,130.79 on the exchange. He did not include this amount in the taxable income reported in his 1957 income tax return. Respondent determined it was taxable as ordinary income. The four lots transferred by petitioner to Lillian Levikow in the August 1957 exchange were the following: DatePeriodLotAcquiredHeldLot 16, Block 1, IslenairNo. 18/12/3720 yrs.Lot 1, Block 4, IslenairNo. 28/12/3720 yrs.Lot 2, Block 7, IslenairNo. 28/12/3720 yrs.Lot 18, Block 12, RolandoNo. 23/ 8/5615/12 yrs. The Rolando lot is the same lot that was transferred to U.S. Holding Company in September of 1955, and reacquired on March 8, 1956, from U.S. Holding Company by a transfer of cash and a commercial*233 lot. The three Islenair lots were commercial lots acquired on August 12, 1937, by petitioner through foreclosure of improvement bonds. Petitioner had retained the four properties transferred in the Levikow exchange because they were either commercial or desirable "view" lots. Prior to the exchange they had been carried in the books of account of petitioner in General Ledger Account No. 124, entitled "Real Estate Held For Sale". They were held by petitioner primarily for sale to customers in the ordinary course of his trade or business. The sole property acquired by petitioner in the Levikow exchange was a portion (approximately 163 by 240 feet) of Parcel "O" of Lot 10, Rancho Mission of San Diego. This property was zoned for commercial use; and it adjoined a commercial property on the corner of College Avenue and Federal Boulevard which petitioner had previously acquired out of Trust R-14066. Petitioner still owns parcel "O" of Lot 19 and has not put this property to any use. Trust R-13316: The real property which became the subject of Union Title Insurance and Trust Company Trust No. R-13316 was originally owned by Katherine Robinson Judson. It consisted of approximately 147.96*234 acres of undeveloped land in San Diego County, being a portion of Parcel "O" of Lot 19, Rancho Mission of San Diego. The petitioner, along with Joseph Levikow, acquired an option on the property in 1951. Subsequently in 1951, petitioner transferred his 50 percent interest in the option to J. W. Anderson; and Anderson, Levikow and Donald I. McKillop exercised the option to purchase the property on terms involving a cash payment and deferred payments. Title to the property was taken in the name of Union Title Insurance and Trust Company, as trustee of Trust R-13316. The Declaration of Trust governing Trust R-13316 is dated January 3, 1952, and was executed by the trustee and ratified by Joseph and Lillian Levikow, Donald I. and Jessie E. McKillop, and J. W. and Majel B. Anderson, the beneficiaries (husbands and wives) named in the trust. Although J. W. and Majel B. Anderson are named in the January 3, 1952, Declaration of Trust as beneficiaries with an undivided one-half interest, the Andersons had in fact assigned half of their interest (a one-quarter interest in the trust) to A. J. and Estella W. Sutherland. Anderson was unable to pay his share of the cash consideration required*235 to be paid to Katherine Judson, the seller of the property, and petitioners, in January of 1952, acquired the beneficial interests in the trust of both the Andersons and the Sutherlands. On his books of account, petitioner set up his interest in Trust R-13316 in his General Ledger Account No. 178-B, entitled "Investment in Trust #R-13316 - Union Title Ins. & Trust Co." The declarative provisions of Trust No. 13316 recite that no consideration for the trust property was paid by the trustee, said consideration having been paid by the beneficiaries; that the whole title, legal and equitable in fee to the Trust Estate, as may be necessary for the execution of the trust, is vested in the trustee; that the beneficiaries take "no estate or interests" therein; and that their interest is "personal property consisting only of the right to enforce the due performance" of the trust. The operative provisions of the trust provide, in part, that the trust is created, under the laws of California, for the purpose of liquidating the real property; that the trustee is to subdivide and sell such property; that various powers are given to the trustee which are appropriate to that end; and that proceeds*236 of sales are to be paid over to the beneficiaries after payment of various commissions and other charges. The 147.96 acre tract which became the subject of Trust R-13316 was brought to the attention of petitioner and his associates in the latter part of 1951 by two brokers, Culmer and Rundel. It was cut by two canyons, and the elevation of the property changed from north to south as much as one hundred feet. About 35 to 40 of the 147.96 acres were fairly level. Before the remaining acreage could be subdivided a considerable amount of dirt had to be moved. Federal Boulevard was at the extreme southern end of the property. When the option to purchase was exercised in 1951, the only sewage facilities available to the property fell to the north. A fairly level portion of the property, consisting of 28.44 acres, was within the gravity flow limits of those facilities, and at the time they acquired their interests in the property, petitioner and his associates intended to subdivide the 28.44 acres. No sewage facilities were then available to serve the remaining 119.54 acres. They were located within the City of San Diego, which does not permit cesspool installation on property within*237 the city limits. Petitioner and his associates thought the 119.54 acres would increase in value and that they would eventually sell this acreage, but they did not have in mind any specific sale. In the latter part of 1952 the County of San Diego revealed plans to extend its trunk line sewer to serve Federal Boulevard, and from this trunk line laterals for sewer service could be extended to provide sewage facilities to the 119.54 acre portion of the Trust R-13316 property. The trunk line was completed in 1953. The property transferred to Trust R-13316 was held by it primarily for sale, and petitioner's interest in that property was held by him primarily for sale to customers in the ordinary course of his trade or business. In 1952 1.246 acres of Trust R-13316 land were sold to a Presbyterian church. The minister of the church solicited the sale. The property involved was on the end of one tip of the land and petitioner and his associates had no special use for it. The gain on the sale was reported as ordinary income. Under date of September 25, 1952, Dennstedt Investment Co., which was active at the time as a builder, requested and was granted two options (the second contingent*238 on the exercise of the first) to acquire parcels of the property covered by Trust R-13316. The first option covered approximately 35 acres, at a price of $2,500 an acre, payable on stated terms. It provided in part that the option could be exercised anytime between January 1, and January 15, 1953. The second option bore the same date, September 25, 1952, and was contingent upon the exercise of the first option. It covered an additional 35 acres, at a price of $2,100 an acre, payable on stated terms. It incorporated the terms of the first option. Dennstedt Investment Co. did not exercise either option, for the reason that it learned in January 1953 of tentative plans of the State Division of Highways to run a freeway through the area. The company formally released its rights under the options on February 9, 1953. In 1953, 32 acres of the Trust R-13316 property were sold to Martin L. Gleisch. The sale was unsolicited, and was arranged by brokers representing Gleisch, who were paid a commission on the transaction. Gain on the sale was reported as ordinary income. The 28.44 acre portion of the Trust R-13316 property was subdivided by the trust into 100 lots (none of which were*239 commercial lots) and called Rolando Park No. 4 subdivision. All of these lots were sold in 1953 and petitioners' share of the gain realized was reported by them as ordinary income on their 1953 income tax return. After the sale to the Presbyterian church, the sale to Gleisch, and the sales of the Rolando Park No. 4 lots, there remained in Trust R-13316 about 86 acres, consisting of a 69.204 acre tract, and approximately 17.07 acres of potential commercial property fronting on Federal Boulevard, located on the southern end of the original 147.96 acre tract. From the inception of Trust R-13316 until 1953 the 17.07 acre Federal Boulevard frontage was unzoned. In April or May of 1953 application was made to the Planning Commission for a "C", or commercial zoning, for this acreage, and the petitioner handled the details of the application. The proposed commercial zone was to cover the entire Federal Boulevard frontage and extend northward for a depth of from 350 to 400 feet. A representative of the State Division of Highways appeared before the Planning Commission and opposed the rezoning on the ground that the State intended to put a freeway through the area, and the Planning Commission*240 refused to grant the rezoning. An appeal from its decision was taken to the County Board of Supervisors, and it overruled the Planning Commission and granted commercial zoning for the 17.07 acre Federal Boulevard frontage. The final route of the freeway was adopted on June 17, 1953. It disclosed that the portion of the 17.07 acres to be condemned by the State for freeway purposes (approximately 10 acres) covered the northerly, or rear portion of the Federal Boulevard commercial frontage, leaving a frontage of some seven acres (250 feet wide by about 1,250 feet long) sandwiched between the freeway on the north and Federal Boulevard on the south. In the early part of February 1954, Norman Lighthart, a real estate broker, told petitioner that he had a client who might be interested in purchasing the portion of the 86 acres remaining in Trust R-13316 that was not included in the Federal Boulevard frontage of 17.07 acres. This, as already noted, amounted to 69.204 acres. Petitioner and his associates agreed to pay Lighthart a commission of five percent of the purchase price if he consummated a sale. The prospective purchaser was George A. Scott. Scott referred Lighthart to Fred B. Mitchell, *241 a member of a firm which specialized in the planning and use of land for various purposes including shopping centers. Mitchell, acting for and at the request of Scott, made a survey and study of the 69.204 acres which convinced him that it was a suitable location for a shopping center. Under date of February 24, 1954, the beneficiaries of Trust R-13316 entered into a written agreement with Mitchell (acting for Scott) to sell him their beneficial interests in Trust R-13316 for $220,500, which sales were to become effective unless Mitchell gave written notice to terminate the agreement prior to August 16, 1954 (a date subsequently extended to September 16, 1954). The agreement described the property then held in the trust, which was the 69.204 acres of real property remaining after eliminating the property reserved for freeway condemnation and the Federal Boulevard frontage. Prior to the February 24, 1954, agreement with Mitchell, and on or about January 4, 1954, the beneficiaries of Trust R-13316 caused to be transferred to Union Title Insurance and Trust Company, as trustee of Trust R-14066, the cash ($3,446.56) then in Trust R-13316, plus 17.07 acres of Trust R-13316 property*242 (consisting of land in the process of being condemned by the State, 10 acres, and the Federal Boulevard frontage, seven acres), leaving in Trust R-13316 the 69.204 acres described in the February 24, 1954, Mitchell agreement. Release prices were paid to Katherine Judson covering the properties taken out of Trust R-13316 and placed in Trust R-14066. The reason the beneficiaries of Trust R-13316 contracted to sell their beneficial interests in the trust to Mitchell, rather than the underlying real estate, was that a release price on 69.204 acres would have to be paid to Katherine Judson to take the property out of the trust and the beneficiaries were unwilling to do this prior to receiving cash from the potential purchaser. They concluded that in the circumstances it would be "easier" to take the other property out of Trust R-13316 (and in the process pay a release price on only 17.07 acres), leaving in the trust the property Mitchell (or Scott) was interested in; and then agree to sell the beneficial interests in the trust to Mitchell (or Scott). Under date of September 14, 1954, Mitchell assigned to Scott the agreement of sale and purchase of the beneficial interests in Trust R-13316. *243 Scott consummated the purchase, and petitioners realized a gain of $54,472.15 in 1955 as a result of the transaction. They reported this amount as long-term capital gain in their 1955 income tax return. Respondent determined it was taxable as ordinary income. The beneficiaries of Trust R-13316 paid Norman F. Lighthart a commission of five percent of the purchase price. Since Scott acquired the 69.204 acres, there has been constructed thereon a shopping center named "College Grove". Trust R-14066. Trust R-14066 was created on January 4, 1954, with the Union Title Insurance and Trust Company, of San Diego, California, as trustee. The Declaration of Trust provides, in part, as follows: This trust is a passive trust only and the sole duty of Trustee hereunder is to convey and transfer said real and personal property and to disburse any money upon the order of the Trustor hereunder, jointly or as otherwise hereinafter provided, without responsibility for any consideration received therefor. * * *Trustee hereunder makes no representations and assumes no liability as to the character, extent or validity of the title to any property received hereunder, nor for adverse or conflicting*244 claims of other persons, any title acquired by Trustee being only the naked, legal title to said property. * * *The creation of this trust is not intended to nor shall it relieve Trustor of any of the duties and/or obligations which ordinarily devolve upon the absolute owner of real property and Trustor hereby expressly agrees that it is the duty of Trustor to preserve and protect the property constituting the Trust Estate and keep the same in good repair, said Trustee having no power hereunder to do so. * * *Trustor hereunder hereby reserves the full and complete possession of any real property held hereunder, together with all the rents, issues and profits which would accrue to the absolute owner thereof * * *. The parties named as Trustors in the Declaration of Trust are the same as the beneficiaries of Trust R-13316, and their interests in the trust are the same as in Trust R-13316, petitioners' interest being an undivided 50 percent. On his books of account, petitioner set up his interest in Trust R-14066 in General Ledger Account No. 178D, entitled "Investment in Trust R-14066." On or about September 27, 1955, the State of California completed the condemnation*245 of 10 acres of Trust R-14066 land for freeway purposes, and paid a consideration of $40,000 therefor, or an average of about $4,000 an acre. Petitioners realized a gain of $10,393.69 in 1955 on the condemnation of their 50 percent interest in the land. They reported this amount as long term capital gain in their income tax return for 1955. Respondent determined it was taxable as ordinary income. The 10 acres sold to the State of California was held by Trust R-14066 primarily for sale, and petitioner's interest in that land was held primarily for sale to customers in the ordinary course of his business. On or about October 12, 1955, petitioners received from Trust R-14066, in cancellation of their interest in the trust, a deed to 50 percent of the seven acres of commercial frontage on Federal Boulevard. Petitioners still own this property, which adjoins the Federal Boulevard frontage acquired by petitioner in August, 1957, in the Levikow exchange. Trust 2018 - Murray Hills Estates. Trust 2018 was created on May 24, 1948, with Southern Title & Trust Company as trustee. This company was later merged into Security Title Insurance Company. For convenience of reference the trustee of*246 Trust 2018 will be referred to by the latter name. The declarative provisions of Trust 2018, as amended on May 24, 1948, state that Benjamin Polak, Ralph Hosenpud, Joseph Levikow, and petitioner B. B. Margolis, each have an undivided one-fourth beneficial interest with their respective wives as joint tenants; that title to certain real property, situated in the County of San Diego, State of California, has been conveyed to the Trustee and $5,000 has been deposited by the beneficiaries; that title is held by the trustee for the beneficiaries upon the understanding that the trustee will convey or otherwise deal with the trust property as it may in writing be directed by any two of the following persons: Benjamin Polak, Joseph Levikow, and petitioner; that the trustee may act upon such instructions in all matters concerning the administration of the trust; and that the $5,000 is held by the trustee as a tax and general expense fund. The operative provisions provide, in substance and in part, that the trustee shall not be required to pay any expenses connected with the property nor to care for or manage it; that it shall be given notice of the sale or transfer of any beneficial interest; *247 that it shall not be personally liable for any instruments executed by it pursuant to the terms of the trust; that the beneficiaries shall have the sole and exclusive use, occupation, management and control of the trust property; and that the trustee shall not be required to execute any deeds or other instruments covering the trust property which would constitute a violation of the California Real Estate Act or the California Subdivision Map Law. Petitioners originally had an interest as joint tenants to an undivided one-fourth beneficial interest in Trust 2018, and Joseph Levikow and his wife had a similar undivided one-fourth beneficial interest. However, on or about January 8, 1951, petitioners assigned to Benjamin Polak, Benjamin Edward Polak, and Byron James Polak a 7.5 percent interest in the Trust, thereby reducing the petitioners' beneficial interest to an undivided 17.5 percent interest and at the same time the Levikows disposed of an 8.75 percent interest in the Trust thereby reducing their beneficial interest to an undivided 16.25 percent interest. Trust 2018 had title to approximately 335 acres of undeveloped land in the City of La Mesa, San Diego County, being a part*248 of Parcel A of Murray Acres. It was unimproved property, consisting primarily of a ridge about a mile and quarter long, rocky, sloping off to the north and south steeply in spots. It was surrounded on four sides with residential development, and was in a desirable part of the City of La Mesa. It was in a good location and had fine views of Mexico, the Pacific Ocean, and portions of San Diego. When acquired it was outside the boundaries of the La Mesa, Lemon Valley & Spring Valley Irrigation District and not qualified to receive water; and the District refused to include the property in the District for lack of water. However, in 1955 more water was made available to the Irrigation District by the Metropolitan Water District's second aqueduct serving the San Diego area, and the property was included in the Irrigation District. By October of 1954, the number of the beneficiaries of Trust 2018 had increased, and their undivided interests had changed in amount, but petitioners still owned a 17.5 percent interest in the trust and Joseph Levikow and his wife a 16.25 percent interest. In addition to the petitioners and the Levikows, there were eight other individual beneficiaries, one corporate*249 beneficiary, and two partnership beneficiaries, with a total of five general partners. The combined holdings of the other beneficiaries (that is, other than petitioners and the Levikows), in varying percentages, represented the controlling interest in the trust (66.25 percent). By October of 1954 petitioner and the Levikows had grown dissatisfied with the turnover in the ownership of beneficial interests in Trust 2018, and it had reached the point where most of the beneficiaries were strangers to them. As a consequence, they negotiated with the other beneficiaries for a division of trust property and for a transfer of their portion out of trust, and in October of 1954, the beneficiaries agreed among themselves to a distribution of the real property in the trust in the proportions of 104.7 acres to petitioner and Joseph Levikow, or their nominee, with the remaining acreage to the remaining beneficiaries. Petitioner and Levikow designated a corporation, Murray Hills Estates, Inc., as their nominee to receive title to the 104.7 acres. Murray Hills Estates, Inc., a California corporation, had been incorporated on April 20, 1950, for the purpose of acquiring and dealing in land. However, *250 the corporation remained dormant until late in 1954. Petitioner and Joseph Levikow were two of the three incorporators, and two of the three directors. On October 14, 1954, Murray Hills Estates, Inc. was reactivated, and its board of directors held a special meeting which was attended only by petitioner and Levikow. At this meeting Levikow was elected president and petitioner secretary-treasurer of the corporation, the contemplated transfer to it of the 104.7 acres of Trust 2018 land in exchange for its stock was discussed, and the following resolutions were adopted: * * * Be it RESOLVED; that the officers of this Corporation be, and they hereby are, authorized and directed to acquire from B. B. Margolis and Joseph Levikow the real property hereinabove set forth; and It is further RESOLVED that the present net fair market value of said real property, and the fair value thereof to this Corporation, and the fair value thereof for the purpose of issuing shares of stock in this Corporation in exchange thereof is $25,000.00. It is further RESOLVED that the officers of this Corporation be, and they hereby are, authorized and directed, subject to the approval of the Commissioner*251 of Corporations of the State of California, to issue 250 shares of stock of the Corporation as follows: 130 shares to B. B. Margolis and 120 shares to Joseph Levikow, upon the Corporation's receiving title to said real property. IT IS FURTHER RESOLVED that the officers of this corporation be and they hereby are authorized and directed, or caused to be prepared and filed on behalf of this Corporation, an application to the Commissioner of Corporations of the State of California, for a permit authorizing this corporation to acquire said real property and to issue in exchange therefor 250 shares of capital stock in this corporation to each of said persons. In December, 1954, Murray Hills Estates, Inc., filed with the California Division of Corporations an application to issue 250 of its no par shares, valued at $100 a share, as follows: (a) TO JOSEPH LEVIKOW, one hundred twenty (120) shares for his forty-eight per cent (48%) interest in the real property referred to in the minutes of the Special Meeting of the Board of Directors, dated October 14, 1954. (b) To B. B. MARGOLIS, one hundred thirty (130) shares for his fifty-two per cent (52%) interest in the real property referred*252 to in the minutes of the Special Meeting of the Board of Directors, dated October 14, 1954. On January 7, 1955, the California Commissioner of Corporations issued the permit to the corporation as follows: 1. To sell and issue to Joseph Levikow and B. B. Margolis, or to either or both of them, an aggregate of not to exceed 250 of its shares, for the considerations, uses and purposes, and in the form and manner set forth in its application for this permit. The permit further stated that it was issued on the following condition: (a) That when issued all documents evidencing any of the securities authorized by paragraph 1 hereof shall be forthwith deposited with the escrow holder heretofore selected by applicant and approved in writing by the Commissioner of Corporations, to be held as an escrow pending further written order of said Commissioner; that the receipt of said escrow holder for said documents shall be filed with said Commissioner; and that the owner or person entitled to said securities shall not consummate a sale or transfer of said securities, or any interest therein, or receive any consideration therefor, until the written consent of said Commissioner shall have been*253 obtained so to do. On January 10, 1955, Murray Hills Estates, Inc. issued to petitioner 130 shares of its capital stock, evidenced by its stock certificate No. 2; and petitioner on the same date delivered the stock certificate to Frank Pomeranz, an attorney, who was acting as escrow holder approved by the Commissioner of Corporations. The 104.7 acres of Trust 2018 property had not yet been conveyed by the trustee to Murray Hills Estates, Inc. at the time (January 10, 1955) the corporation issued its shares of stock to petitioner and Joseph Levikow. The trustee required the written consents of all of the beneficiaries of Trust 2018 as a condition to a conveyance of Trust 2018 land to Murray Hills Estates, Inc. The written consents of the beneficiaries to the conveyance were obtained on forms entitled "Order To Convey Trust Property," addressed to the trustee and bearing spaces for the signatures of the beneficiaries, who then numbered 17, including a corporation (two signatures required); a partnership, with two required signatures; another partnership with three required signatures; or a total of 21 required signatures. It took some time to obtain the required signatures, since*254 some of the beneficiaries were located in other parts of the country. The signatures were obtained on four separate order forms, three of which are dated April 14, 1955, and one which is dated May 10, 1955. Joseph Levikow handled the matter of obtaining the signatures of the beneficiaries on the order forms. On April 15, 1955, a deed granting the 104.7 acres of Trust 2018 land to Murray Hills Estates, Inc., executed by the trustee, Security Title Insurance Company, was recorded at the request of the trustee in the official records of San Diego County, California. This is the deed by which Trust 2018 conveyed the property to the corporation. There are alterations on the trustee's grant deed as follows: (a) The date of execution is shown as "January 10, 1955," but the "January 10," part is typed over an erasure; and the erasure was made after the trustee's corporate seal had been impressed on the deed. (b) In the acknowledgment portion of the deed, the original date "January 10th, 1955" is typed over an erasure, with evidence remaining that the date "April 14, 1955" was erased. Petitioner did not know who made the erasure on the trustee's grant deed, nor did he know the date, *255 if any, that was erased. In February or March of 1955, Benjamin Polak (one of the beneficiaries of Trust 2018), an officer of and acting for Heartland Hills, a California corporation, asked petitioner and Levikow if they would be interested in "selling." He offered them a "good price" and they granted Heartland Hills an option to purchase the stock of Murray Hills Estates, Inc. The consideration for the option was $5,000, which was to be applied on the purchase price in the event the option was exercised. The agreement granting Heartland Hills the option to buy all of the stock of Murray Hills Estates, Inc. is dated March 26, 1955. It recites a consideration of $115,000 for the stock, to be due and payable only when all of the following conditions were met: (a) The exercise of the option by Heartland Hills. (b) The sellers have secured the permission of the Commissioner of Corporations to a transfer of the stock to the buyer. (c) Ownership by Murray Hills Estates, Inc. of a fee simple title to the real property, free and clear of all encumbrances, obligations or liens of any kind or nature, except current taxes, assessments, restrictions, and rights of way of record. (d) *256 Murray Hills Estates, Inc. shall be free of indebtedness of every kind and nature, except for current real estate taxes and assessments against the real property. The option agreement provided that the option must be exercised after August 15, 1955, and before August 30, 1955, by written notice. Security Title Insurance Company acted as escrow holder in the matter of the Heartland Hills option to acquire the stock of Murray Hills Estates, Inc. from petitioner and Levikow. The transaction was concluded on August 25, 1955; and on or about August 27, 1955, petitioner received his share of the net consideration paid by Heartland Hills for his stock in Murray Hills Estates, Inc. He realized a gain of $46,911.98 on the transaction, which petitioners reported as long term capital gain in their joint income tax return for 1955. Respondent determined it was taxable as ordinary income. On August 25, 1955, Security Title Insurance Company delivered to Heartland Hills 250 shares of the stock of Murray Hills Estates, Inc. (including petitioner's 130 shares) endorsed for transfer; and on the same date Murray Hills Estates, Inc. issued to Heartland Hills its stock certificate No. 3 for 250*257 shares, in exchange for the shares of petitioner and Joseph Levikow. The California Commissioner of Corporations consented to the transfer of petitioner's and Levikow's shares to Heartland Hills upon condition that when the shares were reissued to Heartland Hills, the new certificate be forthwith deposited in escrow with Frank Pomeranz to be held in escrow in accordance with the original permit to issue the shares, dated January 7, 1955. The steps taken by petitioner and Levikow in reactivating Murray Hills Estates, Inc., causing to be conveyed to it their interests in 104.7 acres of land, having it issue its stock to them in proportion to their interests in the land, and transferring such stock to Heartland Hills for $115,000, were component parts of a single transaction, by which they effected a sale of land. Petitioner's interest in the land sold was properly held by him primarily for sale to customers in the ordinary course of his business. Trust S-275. Trust S-275 was created on June 1, 1948, through the medium of a document entitled "Real Estate Sales Trust, Security Trust and Savings Bank of San Diego, Trust No. P.T. S-275". It was formed to acquire (on or about June 1, 1948) *258 80 acres of real estate in the City of San Diego, described as follows: (a) A portion of Pueblo Lot 211 of the Pueblo Lands of San Diego. (b) Loma Alta No. 2: BlockLotsFractional Block 20 1/2211 through 9225 through 7 &11 through 172317 through 21The names and percentages of beneficial interest of the trustors and beneficiaries of Trust S-275, and their occupations (occupation of the husband, in the cases of joint ownership by husband and wife) are as follows: Percentage ofNamesOccupationInterest(a) Allen J. and Estella W. Sutherland (original interest12 1/2% but one-half transferred to Katherine Craw-ford, see (k) infra)Banker6 1/4%(b) J. K. Stickney, Jr.Attorney12 1/2%(c) Donna Warner Markey (a.k.a. Donna Basset Carl)Housewife6 1/4%(d) Joan Warner RecabarenHousewife6 1/4%(e) Opal M. BradyHousewife10%(f) Pfaeffle & Elvie SimpsonRetired NavalOfficer12 1/2%(g) Joseph & Lillian LevikowAssociate ofPetitioner7 1/2%(h) John and Julia HoldererPlumber10%(i) PetitionersReal Estate &Insurance15%(j) Donald McKillopBuilder7 1/2%(k) Katherine CrawfordHousewife6 1/4%Total100%*259 The declaration of trust provides in substance and in part as follows: Section 1. The trustee received title to property and $3,524.40. No consideration for the property was paid by the trustee. The trustors declare that they are establishing this trust for the purpose of and as a convenient means of selling and disposing of the described real estate and of handling all transactions in connection therewith. Section 2. The purposes of the trust are: (1) To sell the real property; (2) To pay off encumbrances on the real property; (3) To provide for the payment of taxes, assessments and other expenses connected with the sale of the property and the operation of the trust; (4) To provide for security and for any advances that may be made by the trustee for trust purposes; (5) To provide for disposition of the proceeds of the proceeds of the trust property. Section 3. The trustee shall have power to hold legal and equitable title to all property conveyed to it hereunder, all contracts in connection therewith, and the proceeds of all such property and contracts. The trustee is not required to incur any personal obligations. Section 4. The trustors reserve the right to change or*260 amend or terminate the trust, but any amendment affecting the rights of the sales agent requires his approval. Section 5. B. B. Margolis is appointed sales agent for the real estate conveyed to the trustee and accepts such responsibility under and subject to the provisions hereof and the instructions of the Trustors and the trustee. The sales agent is not the representative or agent of the trustors, or of the trustee; he is an independent real estate broker having authority to effect sales in accordance herewith. The trustors and the trustee may terminate the sales agent's rights and authority for failure to make reasonable progress in selling the property. Section 6. All the real estate conveyed to the trustee hereunder is to be sold. It may be sold as a unit or in parcels in the discretion of the sales agent. Upon consummation of any sale the trustee shall pay to the Sales Agent 10% of the selling price. * * *Section 10. The trustee holds the entire legal and equitable title to all property under this trust and the interest of each beneficiary is personal property. The trustors and the sales agent shall have only such possession or occupancy of the land as is necessary*261 in connection with their selling activities. Any beneficiary may assign his interest in this trust, provided, however, that any such proposed assignment shall be approved in writing by trustors holding 51% interest in this trust, exclusive of the interest about to be transferred. * * *Section 13. Upon the trust property being reduced to money, the trustee shall proceed to pay all existing obligations, close the trust, and distribute all money to the persons entitled thereto under the provisions hereof. The beneficiaries of Trust S-275 paid $80,000 for the 80 acres transferred by them to the trust. While this property was in the hands of the prior owner, it was the subject of a court proceeding in the nature of condemnation, in the course of which the United States Public Housing Administration was granted the exclusive use of 52.12 acres of Pueblo Lot 211 for the erection and maintenance of low cost rental housing units. The Public Housing Administration had erected on the premises approximately forty 8-unit structures, built on concrete slabs, together with underground facilities, oil storage tanks, streets, etc. It still occupied the 52.12 acres of the property in June*262 1948 when the property was acquired by Trust S-275. It was then paying a rental of $1,000, for each fiscal year ending on the last day of February plus reimbursement of the annual real estate taxes paid on the premises occupied by it. Starting with the fiscal year ending February 28, 1953, the rental was increased to $2,400 a year, plus real estate tax reimbursements. The Trust S-275 property was in a "nice" location. The portion of the property not occupied by Public Housing Administration rental units and related facilities varied from level to hilly, and was zoned for residential use, except for a strip (about 120 feet deep and 650 feet long) along West Point Loma Boulevard which was zoned commercial. At the time the property was purchased petitioner and his associates felt that it would appreciate in value, and the prospect of such appreciation, and not the retnal yield, induced them to make the purchase. On the books of account of petitioner, his interest in this trust was set up in General Ledger Account No. 172A, entitled "Investment in Trust P.T. S-275, Sec. Bk." In 1949 or 1950, 19 acres of Pueblo Lot 211 were sold by Trust S-275 to J. W. Anderson Co. for $30,500, the*263 buyer making the initial payment on November 15, 1949, and the final payment on June 2, 1950. The acres sold were not a part of the 52.12 acres occupied by the Public Housing Administration. In March of 1956, Trust S-275 sold the Loma Alta No. 2 lots to J. M. Wilson, the petitioner's office manager, for $4,750, and realized a gain of $2,434.19. These were scattered lots, through or over which ran a slough. The Trust had no use for them and sold them to Wilson at his solicitation. None of the lots sold were part of the 52.12 acres occupied by the Public Housing Administration facilities. The 1949 or 1950 sale of the 19 acres to J. W. Anderson Co. and the 1956 sale of the Loma Alta lots to J. W. Wilson left remaining in Trust S-275 the following properties: (a) The 52.12 acres occupied by the Public Housing Administration. (b) The West Point Loma Boulevard commercial frontage (about 120 feet deep and 650 feet long). (c) A small piece of leased ground occupied by the Bernard School which was sold to the school at the end of the lease under threat of condemnation. With respect to the 52.12 acres of Trust S-275 land occupied by the U.S. Public Housing Administration, that agency*264 continued to pay rent ($2,400 a year, plus reimbursement of real estate taxes paid) for the years through the fiscal rental year ended February 28, 1956; and during the Trust's fiscal tax year ended May 31, 1956, it received $1,363.20 in reimbursement of real property taxes paid. On or before February 28, 1956, the Public Housing Administration served notice on Trust S-275 that it was terminating its exclusive use of the premises (52.12 acres) as of February 28, 1956. At that time there were on the premises approximately 40 concrete slabs each large enough for an 8-unit building, and some concrete tanks previously used to store fuel for heating units. In order to put the property in condition, these slabs and tanks would have to be removed. The trust did not remove them. It filed a claim for damages against the Administration in the United States District Court because of the condition of the property when the lease was terminated. On January 15, 1960, the trust received $7,500 in full settlement of its claim. In September of 1956, a date within the fiscal tax year of Trust S-275 ending May 31, 1957, the Trust sold the 52.12 acres which had been occupied by the Public Housing Administration*265 to David Sapp for $145,900 (about $2,800 an acre), and realized a gain of $104,605.99. This sale left in the Trust only the West Point Loma Boulevard commercial frontage (about 120 feet deep and 650 feet long). A return for each of the fiscal years ended May 31, 1955, 1956 and 1957, was filed on Form 1065 "U.S. Partnership Return of Income", under the name of "Stickney, Sutherland, Margolis Syndicate". Therein the income realized by Trust S-275 during the fiscal year involved and the partners' distributive shares of such income were shown in schedules attached to each return. On the partnership return filed for the fiscal year ended May 31, 1956, the gain of $2,434.19 on the sale to Wilson was reported as a long-term capital gain, and petitioner's distributive share (15 percent) was shown to be $365.13. This amount was reported by petitioner as a long-term capital gain on his return for the year 1956. On the partnership return filed for the fiscal year ended May 31, 1957, the gain of $104,605.99 on the sale to Sapp was reported as a long-term capital gain, and petitioner's distributive share was shown to be $15,690.90. This amount was reported by petitioner as a long-term capital*266 gain on his return for the year 1957. Respondent determined that the gains of $365.13 and $15,690.90 were taxable as ordinary income. Trust S-275 is still in existence and has retained the 120 by 650 foot commercial frontage on West Point Loma Boulevard despite offers to purchase it. David Sapp offered $1.00 a square foot ($78,000) for the property at the time he bought the 52.12-acre tract, but his offer was refused. Petitioner's interest in the land sold to Wilson and to Sapp was property held by him primarily for sale to customers in the ordinary course of his trade or business. Trust 432. Trust 432 was created on January 26, 1955, by an instrument entitled "Holding Trust Agreement P.T. No. 432" in which Security Trust and Savings Bank of San Diego was named as trustee. The original trustors and beneficiaries were as follows: Petitioner, 30 percent interest; Joseph Levikow, 50 percent interest; and L. N. Margolis (petitioner's brother), 20 percent interest. On February 3, 1955, petitioner's interest in Trust 432 was set up on his books of account in General Ledger Account No. 124 entitled "Real Estate Held For Sale." On February 28, 1955, it was taken out of Account No. *267 124 and placed in General Ledger Account No. 179C entitled "Investment in P.T. 432 - El Cajon Acreage". At some undisclosed time or times after creation of the trust each of the original trustors transferred part or all of his interest, and as of 1957 the beneficiaries of the trust and their occupations (occupation of the husband in the case of interests owned by husband and wife) were as follows: Percent inBeneficiaryOccupationTrustPetitionerReal Estate &Insurance20Rose PirotteNurse10Philip and Mary SheaAppraiser5Paul and Ann SheaDoctor5Mary G. SilkRetired10Peter and Patricia SheaDentist5Edward and DorothyZenderBroker10Felix and GeorgiannaSzajnukNot Known35Total100 Petitioner had transferred 10 percent of his interest in the Trust in 1955, and the gain realized was reported as ordinary income in his income tax return for that year. Trust 432 was formed to hold title to 44 acres of land in San Diego County described as follows: Lot 3 in Block 39, and a portion of Lot 5 in Block 33, of the Subdivision of the "S" Tract of Rancho El Cajon. The property was acquired on the basis of a down payment*268 and a note, payable in installments. In late 1954 or early 1955, prior to the time Trust 432 took title to the property, petitioner had an option on the property. He became interested in it because "it had pretty good possibilities and it was a fairly inexpensive piece, [which] had lots of room for appreciation." The trust agreement provided, in part, as follows: 1. The Trustee accepts the conveyance of said property, acknowledges that it has paid no consideration therefor, and agrees that it holds and will hold the title to said property in trust for the Trustors' interests as herein indicated and subject to the order of the Trustors. 2. Trustors and Trustee acknowledge that Trustors hold their beneficial interests as tenants in common. 3. The Trustors agree that this is a simple holding trust wherein the Trustee merely holds title and shall not be required to possess, manage, control, pay taxes or assessments, or be at any expense, or responsible as to the management, control, preservation or protection of the property. 4. It is understood and agreed * * * that the Trustors shall have possession, management and control of said property and of the income therefrom. *269 * * *7. The Trustors further agree that the Trustee may accept and act upon written instructions from Joseph Levikow and B. B. Margolis, as to all matters pertaining hereto, with the same force and effect as if the instructions were signed by all of the individual Trustors * * *. Of the 44 acres of Trust 432 property, a portion was improved with a brick residence and surrounding trees and landscaping, which residence (at all times material to this case) was occupied by the sellers of the property, Ova H. and Meldon V. Presher. The property was hilly, with a change in elevation of from 75 to 100 feet from top to bottom. It was a hill consisting primarily of decomposed granite type of soil. It was located about two miles east of the City of El Cajon, which is about 18 miles from San Diego. Although the Trust 432 property was in the Helix Irrigation District (formerly the Lemon Grove and Spring Valley Irrigation District) the hilly nature of the property presented a water service problem because the pressure was not sufficient to get water uphill, and only a limited amount of water could be obtained. By December 11, 1956, the District had installed a good part of the mains, *270 tanks and pumps sufficient to make water available to the property. This was financed by a bond issue against the land. At the time the Trust 432 property was acquired there were no sewage facilities of any kind. Sewage was a problem in that the Lankershim Tunnel of the Helix Irrigation District cut diagonally through the property, and this tunnel was open, and could result in a contamination of a major water supply if septic tanks were used in connection with any development of the property. At the time the Trust 432 property was acquired petitioner and his associates expected that the water and sewage problems would be overcome; and that the property would appreciate in value and be disposed of at a profit. Petitioner had no knowledge at that time that the California Division of Highways was interested in the property. His first contact with that division relative to the Trust 432 property was in 1956 when the Assistant District Engineer twice requested permission to drill test holes on the premises. After the second request, the engineer explained that the State was thinking of realigning Highway 80 through a small part of the property, and also was interested in taking the*271 entire property in order to use the decomposed granite soil as a road base, if the tests demonstrated that the soil was suitable for that purpose. In 1957 the State started negotiations to purchase the entire property, and gave written notice that the land would be condemned if an agreement on the purchase price could not be reached. An agreement was reached to sell the property for $95,000 and on June 14, 1957, Trust 432 received from the State the net proceeds of the sale, after deducting moneys applied to pay off the purchase money note held by the Preshers. On June 14, 1957, Trust 432 distributed all of its funds to its beneficiaries, and the trust was closed. Petitioner received in distribution his 20 percent of the funds and realized in 1957 a gain of $14,141.12 with respect to Trust 432. In his 1957 return, he reported this gain as a long-term capital gain. Respondent determined it was taxable as ordinary income. Petitioner's interest in the land sold to the State of California was property held by him primarily for sale to customers in the ordinary course of his business. Trusts 473 and 482. Under date of April 9, 1953, Kearney Park Development Corp. (hereinafter sometimes*272 called Kearney Park) and Union Title and Trust Company of San Diego, as trustee under its Trust R-13357, entered into an agreement, entitled "Agreement for Sale of Real Property"; and in due course Union Title conveyed to Kearney Park the real property covered by the agreement, and received in turn the consideration recited in the agreement, including two notes dated June 4, 1953, in the respective amounts of $80,000 and $553,750, each secured by a portion of the real property described in the agreement. The real property acquired by Kearney Park, and which secured the two notes, was vacant real estate located in an area of the City of San Diego known as "Kearney Mesa", being a portion of Lot 72 of the Partition of Rancho Mission of San Diego. The deed of trust securing the $80,000 note covered aproximately 220 acres and the deed of trust securing the $553,750 note covered 360 acres. The land was zoned M 1-A for light manufacturing use. Most of it was choice property, although that securing the $80,000 note was less desirable than the other, in that it was rougher and not as well located. The land had a frontage on Highway 395 of about a mile and a quarter, and also fronted on Kearney*273 Villa Road. As a whole, it was a "nice" piece of property which could be used for residential construction. The real property securing the two Kearney Park notes was subject to the prior lien of Improvement Bonds (sewer and water improvements) issued by the Kearney Mesa Improvement District under the State of CaliforniaImprovement Bond Act of 1911, in the approximate amount of $224,000. The Improvement Bonds (each of which covered a specific parcel of land described by metes and bounds) were 10-year bonds, payable in equal annual installments of principal starting January 2, 1955, and ending January 2, 1964, with interest payable semiannually on January 2 and July 2, starting January 2, 1955. The $80,000 Kearney Park note was dated June 4, 1953, and was signed for the corporation by R. Reese Myers, Vice President, and Donald A. Simonsen, Secretary. It provided for the payment of the principal sum on or before three years from date, with interest at the rate of five percent per annum on any unpaid balance from and after two years from date. It also provided that unpaid interest should bear like interest as the principal; and that on default in the payment of interest, the whole*274 sum of principal and interest shall become immediately due and payable at the option of the holder. The $553,750 Kearney Park note was dated June 4, 1953, and was also signed for the corporation by R. Reese Myers, Vice President, and Donald A. Simonsen, Secretary. It contained a promise to pay the principal amount in installments of (a) $64,750 on or before two years from date, with interest at the rate of five percent per annum, commencing one year from date; (b) $64,750 on or before three years from date, with interest at the rate of five percent per annum, commencing two years from date; (c) $64,750 on or before four years from date, with interest at the rate of five percent per annum, commencing three years from date; and (d) the balance of principal on or before five years from date, with interest on any such balance at the rate of five percent per annum, commencing four years from date. It also provided that any interest not paid would bear the same interest as the principal; and that on default in the payment of interest the principal and interest would become immediately due and payable at the option of the holder of the note. Kearney Park is a large-scale builder in Los*275 Angeles and elsewhere. The property (which secured the $80,000 and $553,750 notes) was acquired by Kearney Park from Union Title and Trust Company in 1953 for the purpose of constructing thereon, and selling, residential houses. The Miramar Naval Air Station at San Diego, California, was, at all times material, the key West Coast jet aircraft base for the United States Navy. It was located about 10 miles north of the city proper, westerly of Highway 395, and east of La Jolla. It was in the Kearney Mesa area - the same area in which was located the property securing the two Kearney Park notes. One of the purposes of the Miramar Naval Air Station was to train Navy jet pilots to land on aircraft carriers. Simulated landings on a carrier ship were practiced on the Miramar runways, and for that purpose there was need of a wide area through which the jets could fly, circle around, and simulate carrier landings. About 1953, the Navy established for its Miramar Station a flight pattern which encompassed an area enclosed by a circle, with a 12,000 foot radius from a point on the Miramar Station, and requested that no buildings be erected within that area. All of the 360 acres securing*276 the Kearney Park $553,750 note, and most, but not all, of the 220 acres securing the $80,000 Kearney Park note were within the flight pattern area, and, as already noted, Kearney Park had planned to build homes on that land. Prior to the establishment of the 12,000-foot flight pattern, the Navy had in effect a 10,000-foot flight pattern. The extension of the flight pattern to 12,000 feet caused quite a "furor" because there were some new subdivisions in the area included in the extension and about a million dollars in water and sewer improvements, with mains laid to conform to the new subdivisions, had been installed. The property in the area was bonded to cover the cost of the improvements. Some of these bonds were issued against, and were a prior lien upon, the property securing the two Kearney Park notes. The establishment of the 12,000-foot flight pattern resulted in a withdrawal of Federal Housing Administration and Veterans Administration financing which, at the time, accounted for 95 percent of the financing for residential construction. This had the effect of restricting building, particularly residential building, in the flight pattern area. In 1955, principal and interest*277 payments on the $80,000 and $553,750 Kearney Park notes were in default and improvement bond and property tax payments were delinquent. The notes were then held by Harry M. Redfield, as trustee for an Iowa estate, the heirs of which were in immediate need of funds, and petitioner learned through a friend tha they could be purchased at a substantial discount. In 1955 and 1956, petitioner acquired from trustee Harry M. Redfield four successive options to acquire the two Kearney Park notes. The options bore the respective dates of June 1, 1955, August 24, 1955, October 27, 1955, and January 14, 1956. As early as August 28, 1955, San Diego newspapers carried news stories about the Kearney Mesa land within the flight pattern of the Miramar Naval Air Station, and about proposed plans for the acquisition of this land by the Navy. In January of 1956, petitioner and three other persons acquired ownership of the $80,000 Kearney Park note, and the deed of trust securing it, for a total consideration of $30,000, and in undivided interests, as follows: Petitioner33 1/3%Joseph Levikow33 1/3%Pauline M. Howarth25%L. N. Margolis (a brotherof petitioner)8 1/3%100%*278 Kearney Park had made no principal or interest payments on the note at the time. Under date of February 2, 1956, petitioner and his three associates created Trust 473, with Security Trust and Savings Bank of San Diego as trustee. They assigned to the trust the $80,000 Kearney Park note and the deed of trust securing it. Under the terms of the "Holding Trust Agreement" their beneficial interests in the trust as "Trustors and/or Beneficiaries" were the same as their interests in the note. The agreement provided, in part, as follows. 1. The Trustee accepts the conveyance of said property [the $80,000 June 4, 1953 note], acknowledges that it has paid no consideration therefor, and agrees that it holds and will hold the title to said property in trust for the Trustor's interests as herein indicated and subject to the order of the Trustors. 2. Trustors and Trustee acknowledge that Trustors hold their beneficial interests as tenants in common. 3. The Trustors agree that this is a simple holding trust wherein the Trustee merely holds title and shall not be required to possess, manage, control, pay taxes or assessments, or be at any expense, or responsible as to the management, control, *279 preservation or protection of the property. * * *5. By agreement of the Trustors expressed in writing and filed with the Trustee, this trust may be revoked and it may be amended in whole or in part and other property added to the trust by agreement in writing of the Trustee and of the Trustors. 6. The Trustors further agree that the Trustee may accept and act upon written instructions from Joseph Levikow, B. B. Margolis, and Pauline M. Howarth, as to all matters pertaining hereto, with the same force and effect as if the instructions were signed by all of the individual Trustors * * *. * * *Petitioner's one-third interest in the $80,000 Kearney Park note and deed of trust was set up on his books of account as General Ledger Account No. 181, entitled "Investment in Trust P.T. 473, Security Tr. & Sav. Bk. (Kearney Park Dev. Co. T.D. Note)." The initial cost basis of petitioner's interest was $10,000. Under date of April 13, 1956, the District Public Works Office, Eleventh Naval District, San Diego (at the request of the Department of the Navy, Washington) sent letters to all property owners of record within an area of 6,750 acres adjoining the Miramar Station, informing*280 the property owners of the appointment of appraisers to determine the value of property within the area. One of those letters, sent to Kearney Park Development Corp., read, in part, as follows: The Department of the Navy has no authority, at this time, to acquire any property, but legislation now in Congress indicates that authority and funds may be approved this session. The purpose of the appraisal survey is to obtain valuation data so that negotiations with the owners can commence as early as possible in the event the land acquisition project is approved. The Redfield option dated January 14, 1956, related only to the $553,750 Kearney Park note; and granted petitioner an option to purchase that note prior to May 20, 1956, for the amount of $270,000. Petitioner and his associates would have liked to acquire it, but did not have the funds. Petitioner presented the matter to Allen J. Sutherland, President of Security Trust and Savings Bank, and Sutherland interested a group of associates who, along with petitioner, Joseph Levikow, and Pauline M. Howarth, acquired the note for $270,000 in May of 1956. The associates and their occupations and interests were as follows: OccupationInterestPetitionerReal estate andinsurance24/120thsA. J. SutherlandBanker12/120A. Paul SutherlandParking lots12/120C. C. DailPolitician2/120Joseph LevikowBroker12/120J. M. WilsonEmployee ofpetitioner2/120Thos. E. SharpRetired20/120Leon W. ScalesAttorney4/120F. S. ParkerRetired6/120Pauline M. HowarthHousewife20/120Fred O. WestUnemployed1/120L. W. KimseyTrust officer1/120Total120/120ths*281 Kearney Park had made no principal or interest payments on the $553,750 note at the time (May, 1956) it was acquired by the associates. Under date of June 4, 1956, the 12 owners of the $553,750 Kearney Park note created Trust 482, through the medium of executing an agreement entitled "Holding Trust Agreement P.T. No. 482," with Security Trust and Savings Bank of San Diego as trustee; and the associates assigned to the trustee the $553,750 note, and the deed of trust securing it. The beneficial interests of the Trustors and Beneficiaries under the trust were the same as their interests in the note. The provisions in paragraphs 1, 2, 3 and 5 of the Trust 482 agreement are the same as those of the Trust 473 quoted above. The Trust 482 agreement also provided in part, as follows: 8. No Trustor shall have the right to encumber or hypothecate his beneficial interest in this trust * * *. 9. No Trustor shall have the right or power to sell, transfer or otherwise dispose of, except by Bequest or through descent or to members of his immediate family * * *, any interest in the Trust Estate without first offering the said interest for sale to the other Trustors at the actual price at*282 which it is proposed to sell such interest * * *. 10. It is hereby understood and agreed that no sale or transfers of any portion or all of said Trust Estate shall be made unless approved by the person or persons owning at least 60% of the total of 100% of ownership of said Trust Estate and the Trustee herein is authorized to act upon and carry out any such sale when approved by the aforesaid 60% of ownership. 11(a). It is hereby agreed that Trustors owning at least sixty per cent (60%) of the total of 100% of ownership of said Trust Estate shall have the authority, from time to time, to furnish the Trustee with minimum sales prices and terms of sale of said land, or any portion thereof, and to exercise any and all powers of Trustors hereunder with respect to the administration of this Trust and the disposition of said land; * * *. 12. Upon the instructions of Trustors owning at least sixty per cent (60%) of the Trust Estate, the Trustee is authorized to enter into an agreement with the owners of the land underlying the Deed of Trust hereinabove described whereby the Trust Estate shall participate with said owners in any gain realized from the sale to or condemnation by the United*283 States of America of said land, or any part thereof. * * * 13. Any moneys realized from the payment of the promissory note and Deed of Trust hereinabove described, or from the sale or condemnation of the Trust Estate or any part thereof, shall be distributed as follows: First: To payment of Trustee's fees and expenses. Second: To the Trustors according to their respective interests. Petitioner's 24/120ths, or one-fifth, interest in the $553,750 Kearney Park note and deed of trust was set up on his books of account as General Ledger Account No. 182, entitled "Investment in Trust P.T. 482, Security Tr. & Sav. Bk. (Kearney Park Note)". The initial cost basis of petitioner's interest was $54,000. Petitioner and his associates in Trusts 473 and 482 had no conversations with Kearney Park Development Corp., the maker of the two promissory notes, prior to the respective dates the notes were acquired. Petitioner valued the land securing the notes much higher than the amounts of the notes, improvement bonds, and property taxes that were a lien on it, and was not concerned about whether the corporation could or could not pay the notes. By 1956, two affiliates of Kearney Park, Myers-Kearney, *284 Inc. and Merit-San Diego, Inc., had acquired from Kearney Park the ownership of certain parcels of real property securing the two Kearney Park notes. Under date of June 15, 1956, Security Trust and Savings Bank of San Diego, as Trustee of Trusts 473 and 482, and Kearney Park, Myers-Kearney, Inc., and Merit-San Diego, Inc., as "Owners", entered into an agreement relating to the two Kearney Park notes, the property securing the notes, and also seven and one-half acres previously released from the deed of trust securing the $553,750 note, but now owned by the "Owners". Recitals in the June 15, 1956, agreement are in substance as follows: A. Trustee represents that it is the owner and holder of notes for $553,750 and $80,000, both dated June 4, 1953, secured by deeds of trust on certain described real property. B. Trustee and Kearney Park are parties to contract dated April 9, 1953 for the sale of the real property underlying the notes. C. No payments of principal or interest have been made on the notes and the obligor and obligee disagree as to the extent the notes are in default by reason of certain provisions of the contract of April 9, 1953. D. The land securing the notes*285 is subject to liens of improvement bonds on which payments of principal and interest are delinquent. E. Real property taxes, together with interest and penalties, are also delinquent. F. The United States of America has indicated that it proposes to purchase or condemn all of the lands covered by the agreement, as well as other lands lying within the Miramar Naval Air Station 12,000 foot flight pattern, and it is understood that Government appraisers have already commenced an appraisal of the lands lying in the flight pattern, preparatory to such purchase or condemnation. G. Trustee is willing to postpone the dates of payment on the promissory notes, and to advance certain payments that Owners are obligated to make in connection with the improvement bonds, in consideration of trustee's being permitted to share equally with Owners in any gain realized from the purchase or condemnation of the land. H. The parties do not agree with the meaning and effect of the contract for sale of real property dated April 9, 1953, in certain respects, and it is desired to rescind the contract and substitute a new agreement with respect to the enforcement of the notes. With reference to the*286 matters recited in the preceding paragraph, the parties to the Agreement dated June 15, 1956, agreed, in substance and in part, as follows: (a) Trustee grants Owners an extension of 18 months, to December 4, 1957, for all payments due or to become due, on the principal and interest of the two Kearney Park notes. (b) Trustee waives any right to claim any default, or defaults, by reason of the failure to pay the Improvement Bond principal and interest payments now delinquent, and by reason of the failure to pay property taxes now delinquent. Trustee further agrees that the failure of Owners to pay the installments of principal and interest on Improvement Bonds, and to pay taxes which may become due on the property between date of this Agreement and December 4, 1957, will not constitute default, or defaults, under the existing deeds of Trust. (c) Trustee will advance funds to pay installments of principal and interest on the Improvement Bonds, sufficient to prevent foreclosure of the Bonds; and the continuing obligation of the Trustee in this regard shall terminate on December 4, 1957. (d) If the land shall be purchased or condemned by the United States, or other governmental*287 authority, and if the compensation therefor shall be made available for payment on or before December 4, 1957, then all of such compensation shall belong to and shall be disbursed as follows: (1) To pay off the Improvement Bonds and unpaid property taxes, if required by the terms of the taking, plus payment of the expenses of sale. (2) To pay in full the principal and interest on the two Kearney Park notes. (3) To reimburse Trustee for moneys advanced to make payments on Improvement Bonds, property taxes, and assessments affecting the land. (4) To pay $150,000 to Owners, representing the agreed amount of their investment in the land. (5) To disburse the balance 50/50 to the Trustee and the Owners. (e) The Trustee and Owners shall cooperate in connection with all negotiations or litigation with the United States or other governmental authority seeking to acquire the land; and each party shall be permitted to participate in such negotiations or litigation through agents and counsel of their own choosing. (f) If, on or before December 4, 1957 the United States or other governmental authority seeking to acquire the land shall file a Declaration of Taking, or shall commence*288 court proceedings, the terms of the Agreement shall be automatically extended until there has been a final determination of compensation due for the taking. (g) In the event the United States has not taken action prior to December 4, 1957, the right of Trustee to share in any proceeds from the sale of the land (other than payment of the two notes and reimbursement for advances) shall cease and terminate. (h) The Agreement dated April 9, 1953, is rescinded in toto. At the time the Agreement dated June 15, 1956, was entered into between the Trustee and the Owners, the only land sale then in prospect was the possibility the land would be taken by the Navy. Pursuant to the terms of the Agreement dated June 15, 1956, and the two declarations creating Trusts 473 and 482, petitioner and his associates undertook the payment of their proportionate shares of the principal and interest on the Improvement Bonds, real property taxes, and other charges on the properties covered by the agreements. On July 27, 1956, funds were appropriated for the Navy in the amount of $400,000,000 (Public Law 814, 70 Stat. 768, "Supplemental Appropriation Act, 1957"). These funds covered authorizations*289 made for the Navy in five previous years, plus "the additional projects as may be authorized by law during the second session of the Eighty-fourth Congress." On August 3, 1956, there was enacted Public Law 968 (70 Stat. 991-1019), which authorized a number of items of construction, land acquisition, etc., for the Army, Air Force, Marine Corps and Navy. Included in the items authorized was the following: Naval air station, Miramar, California: Personnel facilities, operational facilities, training facilities, ordnance facilities, land acquisition, and obstruction removal for flight clearance, $8,835,000. This authorization covered the acquisition of 6,750 acres of land in the Miramar flight pattern. Negotiations for the purchase of the Kearney Mesa land owned by Kearney Park and its affiliates commenced around November 27, 1956, and were carried on between the Public Works Officer for the Eleventh Naval District, San Diego, and Kearney Park Development Corporation. Robert G. Muench, Real Estate Director, was in charge of negotiations for the Navy. On January 7, 1957, another meeting was held at which persons representing the Navy and both the Kearney Park affiliates and Trusts*290 473 and 482 were present. Petitioner and four others representing those interested in the Kearney Mesa land were present at this meeting. At the meeting the Navy announced that it intended to acquire this land; that the purpose of the meeting was to arrive at a price; and that if a mutually satisfactory price was not agreed to, it intended to proceed to acquire the land by condemnation. No agreement was reached, and the Navy informed the conferees that it would submit an offer at an unspecified later date. By December 4, 1957, Security Trust and Savings Bank of San Diego, the trustee of Trusts 473 and 482, had merged into Security-First National Bank, which continued as trustee of the trusts. On that date the trustee and Kearney Park Development Corp., Myers-Kearney, Inc., and Merit-San Diego, Inc. as "Owners" executed an "Amendment to Agreement," which amended, as of December 4, 1957, the Agreement, dated June 15, 1956. It recited that no payment of principal or interest had been made on the two Kearney Park notes; and that no sale or other transfer of the property covered by the agreement of June 15, 1956, had been made. And the Amendment to Agreement went on to provide, in substance*291 and in part, as follows: (a) Trustee grants Owners a 12-month extension from December 4, 1957, to pay principal and interest on the two Kearney Park notes (paragraph 1). (b) Trustee and Owners will each pay one-half of the 1958 principal and interest due on the Improvement Bonds on January 2, 1958 and July 2, 1958 (paragraph 2). (c) Trustee and Owners agree to their respective obligations regarding the payment of current and delinquent real property taxes (paragraph 3). (d) The parties agree that if all or any part of the real property owned by Owners shall be sold to "any one or more persons," including the United States or any agency thereof, and including any State or municipal corporation, on or before December 4, 1958; or in the event all or a portion of the property is condemned by anyone possessing the power of eminent domain, then all sums realized from the sale or condemnation (if sufficient to discharge the first four items listed below) "shall belong to and shall be disbursed and distributed" as follows: (1) To pay the Improvement Bonds and property taxes, if required to be paid by the terms of the sale or taking, plus the costs of sale. (2) To pay principal*292 and interest on the two Kearney Park notes. (3) To pay trustee for advances made to pay principal, interest, and penalties relative to Improvement Bonds and property taxes or assessments. (4) To pay Owners the total of sums paid by them subsequent to June 15, 1956, in payment of principal, interest, and penalties relative to Improvement Bonds, property taxes, and assessments. (5) To pay Owners $150,000, representing the agreed amount of their investment in the land. (6) To pay in full any delinquent taxes on, and Improvement Bond principal and interest of Bonds secured by, any of the subject land not sold or taken, unless the parties otherwise agree. (7) The remainder "shall belong to and shall be distributed to the parties in equal shares." (e) If any land remains unsold or not condemned (after the payment of the first five items listed in (d), supra), "then Owners will convey to Trustee an undivided one-half interest in and to all such land," the conveyance to be made at the time of the distribution of the moneys mentioned in item (7) of (d), supra (paragraph 6). (f) Owners agree to notify Trustee of all bona fide offers to purchase the subject land; and one or more*293 authorized representatives of the Trustee shall participate in the sale negotiations and "no sale shall be effected without the prior approval of Trustee" (paragraph 7). (g) The Agreement dated June 15, 1956, shall remain in full force and effect, to extent not inconsistent with this agreement (paragraph 8). Funds for the Miramar land acquisition appropriated by Congress on July 27, 1956, were not made available to the Navy until February 10, 1958, due to action of the Bureau of the Budget. The funds released on that date were in a reduced amount, which necessitated the scaling down of the Miramar land acquisition from the 6,750 acres originally planned to approximately 5,400 acres. This, in turn, resulted in eliminating a portion of the Kearney Park lands which the Navy had originally proposed to acquire. On February 14, 1958, a conference was held at which Muench and Captain Frorath represented the Navy, and thekearney Park interests and the trustee of Trusts 473 and 482 were represented by Ray Myers, Simonsen, Leon Scales, petitioner, and Howarth. At this conference the Navy made an offer for a part of the properties owned by Kearney Park Development Corp., Merit-San Diego, *294 Inc. and Myers-Kearney, Inc., in the amount of $1,434,000. Although the other parties were thinking originally in terms of an asking price of about $2,500,000, they finally made an offer to sell the following property for $1,500,000: Kearney Park De-Parcels 95, 96, 97,velopment98, 129, 133, 137(part)$1,347,000Merit-San DiegoParcel 13170,000Myers-KearneyParcel 13083,000$1,500,000 This offer was accepted by the Navy. Subsequent to the February 14, 1958, conference, a document entitled "Agreement for Purchase of Real Property" was sent by the Navy to Scales, the attorney, to obtain the signature of Kearney Park. This agreement was executed on behalf of the corporation by Ray A. Myers, Vice President, on February 28, 1958, and his signature and authority were certified to by Donald A. Simonsen, Secretary. The Navy did not execute the agreement until March 5, 1958. Similar agreements were entered into by the Navy and Myers-Kearney, Inc. and Merit-San Diego, Inc. The purchase price recited in the Kearney Park Agreement was $1,347,000. At the time the Agreements for Purchase of Real Property were sent out for signature, the Navy sent to*295 the Attorney General in Washington a "preliminary purchase assembly" in order to obtain his opinion on title. After the Attorney General's opinion on title was received, the Navy, on April 7, 1958, delivered to the Trust Officer of Security First National Bank, San Diego, a check for $1,347,000 for the land purchased from Kearney Park. Subsequently, checks for $83,000 and $70,000 for the land purchased from Myers-Kearney, Inc. and Merit-San Diego, Inc., respectively, were delivered to the Trust Officer of Security-First National Bank. The cashing of the checks delivered by the Navy was contingent upon the recording of deeds showing the property to be free and clear of encumbrances, other than those for public roads and utilities. On April 11, 1958, the following deeds were recorded, reflecting the transfer of title to 458 acres of Kearney Mesa land to the Navy, for an aggregate consideration of $1,500,000: (a) deed by Kearney Park, covering 438.49 acres, for $1,347,000; (b) deed by Myers-Kearney, Inc., covering 11.79 acres, for $83,000; (c) deed by Merit-San Diego, Inc., covering 8.11 acres, for $70,000. The acreage acquired by the Navy from Kearney Park and its affiliates*296 included all of the real property securing the $553,750 Kearney Park note held in Trust 482; and included approximately 106 acres of the approximately 220 acres securing the $80,000 Kearney Park note held in Trust 473. Pursuant to the agreement dated December 4, 1957, entitled "Amendment to Agreement," Kearney Park and its affiliates conveyed to Security-First National Bank, as trustee of Trust 473, an undivided one-half interest in the real property(approximately 114 acres) not purchased by the Navy, and which had been covered by the deed of trust securing the $80,000 Kearney Park note. On March 14 or 15, 1958, petitioner entered into an agreement with Allen J. Sutherland (one of the beneficiaries of Trust 482) to assign to Sutherland his beneficial interests in Trusts 473 and 482 for $200,000. The terms were a cash payment of $80,000, and Sutherland's promissory note for $120,000 due in 90 days. On April 1, 1958, petitioner delivered to Sutherland written assignments of his beneficial interests in Trusts 473 and 482, and on that date the trustee accepted and filed the assignments. On November 1, 1957, petitioner had borrowed $140,000 from the Security Trust & Savings Bank*297 of San Diego (subsequently merged into Security-First National Bank) for which he executed his unsecured promissory note for $140,000 dated November 1, 1957, due on April 30, 1958. During the period January 24, 1958 through March 11, 1958, petitioner paid $60,000 of principal and $1,631.08 of interest. As of April 1, 1958, the unpaid balance of the principal on the note was $80,000. Petitioner received Sutherland's check for $80,000, dated April 3, 1958, and on April 4, 1958, he used the proceeds to pay the $80,000 balance on the $140,000 note which was not due until April 30, 1958. Sutherland left for a vacation in Honolulu the first week of April. Prior to leaving, he gave written instructions (on April 1, 1958) to the trustee of Trusts 473 and 482 "to pay to B. B. Margolis the sum of $120,000 from funds coming to me from the proceeds of either or both of Trusts No. 473 and 482." On April 11, 1958, Security-First National Bank, as trustee of Trusts 473 and 482, received, for distribution as instructed, the entire $1,500,000 paid by the Navy for the Kearney Mesa land (covered by the deeds of trust securing the two Kearney Park notes) which the Navy had purchased. Of this total*298 sum, $261,500 was received in Trust 473 and $1,238,500 was received in Trust 482. The trustee disbursed these amounts in accordance with the provisions of the December 4, 1957 "Amendment to Agreement." Under date of April 15, 1958, the trustee of Trusts 473 and 482 issued checks for Sutherland's shares of the moneys received from the Navy as follows: (a) Trust 473 (33 1/3% interest) $49,863.92 (b) Trust 482 (36/120ths interest): (1) $120,000 to B. B. Margolis as instructed. (2) $124,418.21 to Sutherland. After distribution of the entire net proceeds of the funds received from the Navy, a balance of other cash remained in each trust, namely, $2,774.53 in Trust 473 and $9,882.10 in Trust 482. The April 15, 1958 check for $120,000 issued to petitioner by the trustee on the instructions of Sutherland was actually delivered to him on April 22, 1958. In his income tax return for 1958 petitioner reported a long-term capital gain of $122,769.50 from the "sale" of his beneficial interests in Trusts 473 and 482 to Sutherland for $200,000. Respondent determined that this gain was taxable as ordinary income. Travel and Entertainment Expenses. The amounts deducted by petitioner*299 in his returns for the years 1955, 1956 and 1957 as business expenses for travel and entertainment, and the amounts of the claimed deductions disallowed * by the respondent, were as follows: AmountDisallowed byYearDeductedRespondent1955$2,064.81$1,200.0019561,421.491,200.0019571,501.611,200.00Of the $2,064.81 deducted on the 1955 return, $744.81 ($369.60 plus $375.21) represented a reimbursement to J. M. Wilson, petitioner's Office Manager, for the expenses of his trip to Hawaii, which reimbursement was primarily in the nature of a bonus commemorating Wilson's tenth year of employment by petitioner. In the course of the trip Wilson also made a check of the prices and availability of Hawaiian property. The remaining $1,320 of the $2,064.81 deducted as travel and entertainment expense on the 1955 return represented the total of monthly withdrawals of $110 for 12 months which petitioner claimed as reimbursement for out-of-pocket business expenditures. Of the $1,421.49 deduction*300 claimed in the 1956 return, $15.50 represented the payment of half of the expenses of Martin Liptish in connection with a trip to Taft, California, which trip was made in an attempt to salvage a second trust deed note, secured by a hotel property, which property was being foreclosed by the holder of the first lien. An additional $85.99 of the claimed deduction represented plane fare for a trip to Reno, Nevada, to investigate Paradise Valley land in petitioner's capacity as a broker. On the Reno trip petitioner expended, in addition to the $85.99 for plane fare, about $20.00 to $25.00 for meals and lodging. The remaining $1,320 of the deduction of $1,421.49 claimed for travel and entertainment expense in the 1956 return represented the total of withdrawals of $110 a month for 12 months which petitioner claimed as reimbursement for out-of-pocket business expenses. Of the $1,501.61 deduction claimed in petitioner's 1957 return, $181.61 represented plane fare for three trips to San Francisco, which petitioner made in his capacity of real estate broker in connection with San Pablo Bay land. In addition to the plane fare, petitioner expended on each of the three trips from $20 to $25*301 for meals and lodging. The remaining $1,320 of the $1,501.61 deduction claimed in the 1957 return represented the total of withdrawals of $110 a month for 12 months which petitioner claimed as reimbursement for out-of-pocket business expenses. The amounts incurred by petitioner as business expenses for travel and entertainment were $1,000 for the year 1955, $500 for the year 1956, and $500 for the year 1957. Opinion RAUM, Judge: For a long period of years petitioner has operated extensively in the real estate business in all its phases, and has engaged in over 4,000 real estate transactions. These transactions were undertaken in a variety of ways and his interests were held in many different forms. In a number of instances, trusts were created as a convenient means of holding real property pending sale and petitioner and his associates acquired beneficial interests therein in proportion to the amounts they contributed to acquire the property. In other instances the property was held by corporations in which petitioner owned stock, by partnerships of which petitioner was a member, and by petitioner individually. The real estate involved in his transactions ranged from individual*302 lots to tracts containing several hundred acres, from raw acreage to unimproved and improved lots, from lots zoned for single or multiple residences to lots zoned for commercial usages, and from improved lots with residential dwellings to lots with business buildings. His dealings with respect to real estate have been of such comprehensive character, that he may properly be considered to be in the real estate business in all its aspects. Cf. John W. Williamson, 18 T.C. 653, affirmed, 201 F. 2d 564 (C.A. 4), certiorari denied, 345 U.S. 970; George K. Heebner, Jr., 32 T.C. 1162, affirmed, 280 F. 2d 228 (C.A. 3), certiorari denied, 364 U.S. 921. The issues, with one exception, relate to the taxation of gains realized by petitioner during the taxable years from certain sales or exchanges of property. Their solution depends in most instances upon whether petitioner was holding the property sold for investment or primarily for sale in the course of his business, the contention of petitioner being that he was holding it for investment. The properties involved were largely non-income-producing, mostly unimproved*303 lots or raw acreage, although petitioner did own some income-producing properties. This Court has held that a person may be both a dealer and an investor with respect to his real estate holdings. Charles E. Mieg, 32 T.C. 1314, 1321; Real Estate Corporation, Inc., 35 T.C. 610, 615, affirmed, - F. 2d - (C.A. 10); Eline Realty Company, 35 T.C. 1. Where a person has been active as a dealer in the purchase and sale of real property, the burden is plainly upon him to establish that properties sold by him, particularly where they are non-income producing, were held for investment and not primarily for sale. Cf. Real Estate Corporation, Inc., 35 T.C. 610, 615. His mere testimony that his intent was to hold those properties for such a purpose may not be enough to sustain that burden where it is unsupported by other convincing evidence. Cf. Stern Brothers & Co., 16 T.C. 295, 313. Moreover, the fact that he held some of them for many years prior to sale does not necessarily establish an intention to hold them for investment rather than sale. Stockton Harbor Indus. Co. v. Commissioner, 216 F. 2d 638, 655 (C.A. 9), *304 affirming Tax Court memorandum opinion, certiorari denied, 349 U.S. 904. 1Petitioner's testimony that he was holding properties for investment and not primarily for sale is not convincing. When asked what the term "investment property" meant to him, he testified as follows: A. The term means to me that I am making an investment in something that I either expect to increase in value and show me a profit eventually or in something that I plan on converting into an improvement or leasing in the vacant*305 stage to bring forth income. Q. When do you expect the income from an investment property to come to you? A. That's something that's unpredictable. * * *Q. Would you consider a vacant residential lot an investment property? A. I would under certain conditions. Q. What are those conditions? A. If the lot be well located, that it is an area that would enhance in value and be one - a lot that would be in demand. Q. Would it be a lot that eventually you could resell at a profit? A. Well, if it enhanced you would sell it at a profit. It is quite apparent from this testimony that petitioner regards investment property as including property acquired and held for the purpose of resale whenever it appreciates in value to such an extent that a satisfactory profit can be realized. Cf. Curtis Co., 23 T.C. 740, 755-756, reversed in part on other grounds, 232 F. 2d 167 (C.A. 3). But a real estate dealer who acquires and holds property with the expectation of selling as soon as such a profit can be realized is holding it primarily for sale and not for investment.2Real Estate Corporation, Inc., 35 T.C. 610, 615; Curtis Co., supra;*306 cf. Estate of Eugene Merrick Webb, 30 T.C. 1202, 1211. In considering the tax consequences of the various transactions from which petitioner realized gains during the taxable years, we have attached only limited significance to the fact that many of the properties involved were carried on his books in an account entitled "Real Estate held for Sale", some in an account entitled "Real Estate held for Investment", and others in accounts entitled "Investment in Trust No. ". Petitioner testified that he did not give his bookkeepers instructions as to how or in what account his properties should be carried on his books and that they made the entries in these accounts of their own accord and without his knowledge. 1. U.S. Holding, Sachs, and Levikow Exchanges. Petitioner contends that the U.S. Holding and Sachs exchanges in 1955 and the Levikow exchange in 1957 fall within the nonrecognition of gain or loss provisions of Section 1031(a) of the Internal Revenue Code of 1954, and, in the alternative, that if any or all of the exchanges*307 do not meet the requirements of that section, the gains realized by him on these exchanges are taxable as long-term capital gains under Section 1221(1) of the Internal Revenue Code of 1954. Respondent contends that these gains are taxable as ordinary income. In so far as here material Section 1031(a) provides that no gain or loss shall be recognized if property held for investment (not including property held primarily for sale) is exchanged solely for property of a like kind to be held for investment. The property transferred by petitioner in the U.S. Holding Company, Sachs and Levikow exchanges consisted of 14 lots which he had retained from prior subdivision projects or had acquired through the foreclosure of improvement bonds. The evidence does not show that any of these lots were income producing or that petitioner held them with the intention of converting them into income-producing properties. Nor does it show that he was not holding them for disposition when the time would be ripe. The fact that he might have been able to sell some or even all of them at an earlier date is not inconsistent with a deliberate purpose to hold them for sale at a later*308 time on more satisfactory terms. And when he had the opportunity to sell (or exchange) them for a consideration which assured him a satisfactory profit, he took advantage of that opportunity. That he may have intended to hold them until they appreciated sufficiently in value, and carried out that intention, does not detract from the fact that his essential purpose in holding them was ultimate sale at a profit. After a careful consideration of all the evidence relating to the 14 lots, our conclusion is, and we have found as a fact that they were held primarily for sale to customers in the ordinary course of petitioner's business, and not for investment. 3 In the circumstances, it is not necessary to discuss or decide whether the properties acquired in the three exchanges were to be held for investment. We hold that the exchanges do not qualify under the provisions of Section 1031(a) for nonrecognition of gain or loss. *309 Our finding that the lots transferred were held primarily for sale to customers in the ordinary course of petitioner's business is also dispositive of petitioner's alternative contention inasmuch as such property is specifically excluded from the definition of "capital asset" contained in Section 1221(1) of the Internal Revenue Code of 1954. 4 The gains realized on the U.S. Holding Company, Sachs and Levikow exchanges were therefore not entitled to favored treatment as capital gains and were taxable as ordinary income, as determined by respondent. 2. Trust R-13316. Petitioner contends that in 1955, when Trust R-13316 owned only 69.204 acres of land, he sold*310 his beneficial interest in the trust; that the courts of California have held that the beneficial interest in such a trust is personal property ( Ephraim v. Metropolitan Trust Company of California, 28 Cal. 2d 824, 172 P. 2d 501; Wright v. Security First National Bank, 35 Cal. App. 2d 264, 95 P. 2d 194; Bank of America v. Sparr Realty Corporation, 20 Cal. App. 2d 10, 66 P. 2d 476); that for Federal income tax purposes his interest must therefore be regarded as personal property; that there is no basis in the record for holding that he ever held personal property primarily for sale to customers in the ordinary course of his trade or business; and that the property sold does not fall within any of the exclusions from the definition of "capital asset" in Section 1221(1), and the gain of $54,472.15 realized by him when it was sold is taxable as long-term capital gain and not as ordinary income. We do not agree. Trust R-13316 was created "for the sole purpose of liquidating as a single venture the real property"; and the trustee held the trust estate "to subdivide, sell and convey" and to distribute the net proceeds of any sales among the beneficiaries*311 in proportion to their respective contributions to the cost of the real estate held in trust. Gains realized by petitioner as the result of sales of trust property made prior to the transaction here involved were reported as ordinary income from the sale of property held primarily for sale to customers in the ordinary course of his trade or business. Immediately prior to the sale in issue petitioner and the other beneficiaries of Trust R-13316 caused all of the property remaining in the trust, with the exception of 69.204 acres, to be transferred to Trust R-14066. At the time of this transfer they knew they had a buyer who was ready and willing to purchase the 69.204 acres for development as a shopping center, and after the transfer they entered into a contract to sell him their beneficial interests in the trust rather than the land. The substance of the transaction rather than the form selected by the taxpayer in consummating it is controlling. Here the substance of the transaction was that 69.204 acres of land, in which petitioner acquired an interest in the ordinary course of his trade or business, was sold, and its substance is not affected by the fact that petitioner and his associates*312 chose to clothe the transaction in the garb of a sale of their beneficial interests in the trust. Neither is it affected by the fact that they adopted this form because they sought to avoid paying Katherine Judson a release price for taking property out of the trust. The ultimate effect of the transaction was a sale of land by petitioner and his associates to the purchaser. Petitioner's share of the gain from this sale is gain from the sale of a property interest in land held primarily for sale to customers in the ordinary course of his trade or business, and is taxable as ordinary income as determined by respondent. 3. Trust R-14066. This trust was a passive trust in which the sole duty of the trustee was to hold the "naked, legal title" to the trust property and to convey and transfer such property and to disburse any money as directed by the trustors. It was created on January 4, 1954 to acquire the 17.07 acres of Federal Boulevard frontage and $3,446.56 in cash transferred to it by Trust R-13316. Prior to this transfer the 17.07 acres and other property held by Trust R-13316 had been held for sale by that trust, and in September 1952 it had granted to the Dennstedt Investment*313 Co. options to purchase 70 acres, a part of which consisted of the 17.07 acres acquired by Trust R-14066, which that company did not exercise. As early as June 17, 1953, when the 17.07 acres were held by Trust R-13316, petitioner and the other beneficiaries of that trust (who also became the beneficiaries of Trust R-14066) knew that ten acres of the 17.07 acre tract would be condemned by the State of California for a freeway. At the time this tract was transferred to Trust R-14066 in 1954, the ten acres were in the process of condemnation. Upon the condemnation in 1955 $40,000 was received from the state, and petitioner realized a gain of $10,393.69. Upon the basis of the evidence, we hold that the 10 acres were held primarily for sale, and that petitioner's interest in this land was held primarily for sale to customers in the ordinary course of his trade or business. Respondent did not err in his determination that the gain realized by petitioner was taxable as ordinary income, and not as gain from the sale of a capital asset. Cf. Stockton Harbor Indus. Co. v. Commissioner, 216 F. 2d 638, 655 (C.A. 9). 4. Trust 2018 - Murray Hills Estates. Trust 2018 was a passive*314 trust created in 1948 in which the beneficiaries retained use, occupation, management and control of the trust property consisting of 335 acres of land, the title to which was held by the trustee. In October 1954, an agreement was entered into by the beneficiaries to divide the trust property, pursuant to which petitioner and Levikow became entitled to 104.7 acres and the other beneficiaries to the remaining acreage. Petitioner and Levikow designated Murray Hills Estates, Inc., as their nominee to receive the 104.7 acres. This corporation had been incorporated in 1950 for the purpose of acquiring and dealing on land, but had remained dormant until October 14, 1954 when it was reactivated by petitioner and Levikow who were two of its three directors. At a meeting of its board of directors on that date, the officers of the corporation were authorized and directed, subject to the approval of the California Commissioner of Corporations, to issue 250 shares of stock (130 to petitioner and 120 to Levikow) "upon the corporation's receiving title to" the 104.7 acres of land. On January 7, 1955, the California Commissioner of Corporations authorized the corporation to sell and issue 130 shares*315 to petitioner and 120 shares to Levikow for their respective interests in the 104.7 acres of land. On January 10, 1955, the corporation issued 130 shares of its stock to petitioner and 120 shares to Levikow. The 104.7 acres were not conveyed to the corporation by the trustee of Trust 2018 until April 15, 1955. On March 26, 1955, petitioner and Levikow granted Heartland Hills, a California corporation, an option to buy all of the stock of Murray Hills Estates, Inc. for $115,000. The option was exercised on August 25, 1955, and on August 27, 1955 petitioner received his share of the consideration and realized a gain of $46,911.98 which he reported as a long-term capital gain on his 1955 return. Petitioner contends that the gain realized by him on this transaction constituted gain from the sale of stock, and that since the stock was acquired on January 10, 1955 and sold in August, 1955, the gain constituted long-term capital gain from the sale of a capital asset held for more than six months. Respondent contends that the transaction was in fact a sale of land; that petitioner's interest therein was held primarily for sale to customers in the ordinary course of his business; and that*316 the gain realized by him was taxable as ordinary income. In the alternative he contends that if there was a sale of stock, the stock was held by petitioner for less than six months and the gain realized is taxable as ordinary income. The transaction here involved does not differ materially from that considered by this Court in S. Nicholas Jacobs, 21 T.C. 165, affirmed, 224 F. 2d 412 (C.A. 9). In that case the taxpayer, who had been engaged in the subdivision and sale of real estate for several years, reactivated a dormant corporation, conveyed land to it in exchange for its stock, and subsequently sold all of the stock for $175,000 to a newly formed corporation which was owned by a person desiring to purchase land. We found as a fact, and held, that these steps were component parts of a single transaction, by which the taxpayer effected a sale of land in the ordinary course of business. We also found as a fact that the corporation served no business purpose and performed no business function other than to act as a conduit to transfer the title to the land from the taxpayer to a purchaser of such real estate. In its opinion (at pp. 168-169) this Court said: *317 Whether the transaction in controversy was a sale of petitioner's stock in Subdivision as it purported to be or was in substance a sale by petitioner of his Sacramento real estate in the ordinary course of business is entirely a question of fact. Our ultimate finding, set out above, is dispositive thereof and no useful purpose is to be served by prolonging this opinion with a detailed analysis of the evidence and the factors leading us so to conclude. Suffice it to say that, in reaching such conclusion, we have given full consideration to the entire picture, all the pertinent evidence and the inferences properly to be drawn therefrom. Although petitioner went through all of the formal steps of activating a dormant corporation, transferring the property in question thereto in exchange solely for its stock and then "selling" such stock to a corporation dominated and controlled by one, who, it is admitted, was anxious to acquire the land by whatever means, it seems clear to us that it was of no avail taxwise. All of the separate transfers were but component steps of a single transaction, namely, the sale and transfer of petitioner's Sacramento property to MacBride or to a corporation*318 controlled by him. "* * * A given result at the end of a straight path is not made a different result because reached by following a devious path. * * *" Minnesota Tea Co. v. Helvering, 302 U.S. 609. * * *Consequently, we are constrained to disregard the corporate entity of Subdivision, and hold that it served only as a conduit through which petitioner was enabled to effect a sale of property in the ordinary course of his real estate business; that petitioner's various transactions with and through Subdivision were all parts of a single transaction, and that the gain derived therefrom constitutes and is taxable as ordinary income. Compare Commissioner v. Court Holding Co., 324 U.S. 331, with United States v. Cumberland Public Service Co., 338 U.S. 451. See also Chicago, M. & St. P. Ry. v. Minn. Civic Assn., 247 U.S. 490; Western Maryland Ry. Co. v. Commissioner, 33 F.2d 695. The foregoing excerpts from the Jacobs case are applicable to the various steps taken by petitioner and Levikow in connection with the sale to Heartland Hills. 5 Following that case, we hold that the gain petitioner realized was a gain*319 from the sale of land held primarily for sale to customers in the ordinary course of his real estate business. Cf. Virginia W. Stettinius Dudley, 32 T.C. 564, affirmed, 279 F. 2d 219 (C.A. 2). Respondent did not err in determining that it was taxable as ordinary income.5. Trust S-275. This trust was created on June 1, 1948 by*320 petitioner and about ten other persons for the purpose of and as a convenient means of selling and disposing of 80 acres of real estate which they had purchased for $80,000. The trust instrument stated that the purpose of the trust was to sell the land and distribute the net proceeds to the beneficiaries; petitioner was appointed sales agent. All of the acreage, except for a commercial frontage 120 by 650 feet, was sold in four sales, two of which were consummated in 1956, one in March and the other in September. The March transaction involved the sale by Trust S-275 of Loma Alta No. 2 lots to J. M. Wilson on which a gain of $2,434.19 was realized. This gain was reported as a long-term capital gain on a partnership return filed under the name of "Stickney, Sutherland, Margolis Syndicate" for the fiscal year ended May 31, 1956, and petitioner's distributive share of the gain (15 percent) was shown on the return to be $365.13. In his individual return for 1956, petitioner reported the $365.13 as a long-term capital gain. The September transaction involved the sale by Trust S-275 of 52.12 acres to David Sapp on which a gain of $104,605.99 was realized. This gain was reported as a*321 long-term capital gain on a partnership return filed under the name of "Stickney, Sutherland, Margolis Syndicate" for the fiscal year ended May 31, 1957, and petitioner's distributive share of the gain (15 percent) was shown on the return to be $15,690.90. This amount was reported by petitioner as a long-term capital gain in his return for 1957. Respondent determined that the gains of $365.13 and $15,690.90 were taxable as ordinary income. Petitioner contends that Trust S-275 is a California land trust with respect to which, under California law, the trustee has the legal and equitable title to the trust corpus, and the interests of the beneficiaries are personal property only; that it is a separate tax entity; that respondent has recognized that it is such an entity by determining that his distributive share of the gain from the September 1956 sale to Sapp, reported in the partnership return filed under the name of "Stickney, Sutherland, Margolis Syndicate" for the fiscal year ended May 31, 1957, was taxable to petitioner and reportable by him in his return for the calendar year 1957; that if the taxable entity of Trust S-275 is respected, the determination of whether the gains*322 were capital gains or ordinary income would have to be made by looking only to the activities of the Trust, uninfluenced by the nature of the activities of petitioner and the other beneficiaries, and that inasmuch as the occasional and unsolicited sales made by the Trust do not add up to a "business", the gains from such sales would not constitute gains from the sale of property held primarily for sale to customers in the ordinary course of trade or business and would qualify as gains from the sale of capital assets. He also contends that should the trust be disregarded as a tax entity, there is no justification for including the gain from the Sapp sale in his income for the calendar year 1957. We do not agree. The returns for the fiscal years ended May 31, 1956 and May 31, 1957 filed under the name of "Stickney, Sutherland, Margolis Syndicate" were not returns filed by Trust S-275. No tax was reported to be due on these returns. They were partnership returns filed by and on behalf of petitioner and his associates in a joint venture and not returns filed by the trust as a separate taxable entity. Petitioner and his associates created the trust for the purpose of having it act on*323 their behalf in selling the 80 acres of land they had purchased and in distributing to them their proportionate shares of the net proceeds of any sales. Cf. Trudie T. Munger, 16 B.T.A. 168, 176. By filing partnership returns in which were reported the income from sales made by the trust and their distributive shares of the net proceeds of such sales they acknowledged that the trust was merely acting as their agent in a joint venture and that it was their responsibility to report its income and their distributive shares thereof on a partnership return. They adopted a fiscal year for the partnership (joint venture) ending May 31st. As a member of the partnership petitioner's distributive share of the gain realized upon a sale of partnership property was includible in his individual return for the calendar year within which the taxable year of the partnership ended. Petitioner, therefore, properly reported his distributive share of the gain from the March 1956 sale in his 1956 return and from the September 1956 sale in his 1957 return. Whether that gain is taxable as capital gain or as ordinary income depends upon the purpose for which the property sold was held. Inasmuch*324 as petitioner and his associates created Trust S-275 as an agency to sell the 80 acres which they had purchased and the trust proceeded to make several sales of part of this acreage, including the two sales here involved, it is quite obvious that the land was acquired and held primarily for sale. The gains which petitioner realized from the March 1956 and September 1956 sales were, therefore, gains from the sale of interests in the land sold which were acquired and held by him primarily for sale to customers in the ordinary course of his business. 6 Respondent did not err in his determination that they were taxable as ordinary income. *325 6. Trust 432. This trust was created on January 26, 1955 to acquire title to 44 acres of land. The declaration of trust states that it is a simple holding trust in which the trustors retained possession, management and control of the trust property and the income therefrom. The land involved was hilly, and when acquired lacked water and sewage facilities. Petitioner and his associates expected that the water and sewage problems would be overcome, and that the land would appreciate in value and ultimately be disposed of at a profit. In 1956 petitioner learned that the State was interested in acquiring the entire 44 acres for highway purposes, and in 1957 it purchased the property for $95,000, petitioner's share of the gain realized being $14,141.12. On the basis of the evidence, petitioner contends that the property was held for investment and not primarily for sale in that it was not acquired and held for immediate or early sale but was to be held to await future growth and development before being sold. He also contends that the eventual compulsory sale to the State in 1957 did not change the character of the property from property held for investment to property held for sale. *326 The evidence does not convince us that the Trust 432 property was held for investment and not primarily for sale, and the fact that petitioner and his associates may not have contemplated its immediate or early sale does not necessarily indicate that it was so held. It does convince us that the property was acquired and held with the intention of selling it whenever, either because of the elimination of water and sewer problems, or for other reasons, it appreciated in value to the extent that a satisfactory profit could be realized from its sale. Property held with such an intention may have been purchased as an "investment" in a sense, but we think it quite apparent that it was held primarily for sale and that petitioner, a dealer actively engaged in the purchase and sale of real property, held his interest in the property primarily for sale to customers in the ordinary course of his trade or business. The situation here is to be distinguished from the unusual circumstances that moved the Court to reach a different result in Charles E. Mieg, 32 T.C. 1314. Although the principal petitioner in that case was in the real estate business, his business covered a much narrower*327 range of activities than that of the petitioner herein, and he had never dealt in mountain property of the type there involved. He did not want to acquire it but was forced to do so in order to purchase other contiguous property sought by him, and there appeared to be no market for it at the time of acquisition. On all the facts before us in that case we concluded that it was not held for sale to customers in the ordinary course of business. In the present case, on the other hand, petitioner's real estate business covered a wide range. He dealt in all kinds of property, improved, unimproved, developments, and raw acreage (both acreage suitable for immediate development and acreage requiring improvements such as sewage and water facilities). The property herein was one of the many kinds of property in which petitioner dealt. It was held by him for sale in the ordinary course of his business. In the circumstances, the gain he realized when it was sold was not gain from the sale of a capital asset taxable at capital gain rates, but was gain taxable as ordinary income as determined by respondent. 7. Trusts 473 and 482. This issue relates to the gain of $122,769.50 which petitioner realized*328 with respect to his beneficial interests in Trusts 473 and 482; he contends that it is taxable as long-term capital gain rather than ordinary income. In 1953, Kearney Park Development Corp. purchased approximately 580 acres of land, and issued to the vendor one note for $80,000 secured by a deed of trust covering 220 acres and another for $553,750 secured by a deed of trust covering 360 acres. In 1956, when principal and interest payments on the notes were in default and improvement bond and property tax payments were delinquent, petitioner and several others purchased the two notes at a substantial discount. The $80,000 note was transferred to Trust 473 and the $553,750 note to Trust 482. Both trusts were simple holding trusts in which the trustee merely held title to the trust property and management and control were retained by the trustors. Most of the land securing the notes was within the flight pattern of the Miramar Naval Air Station, and in 1955 San Diego newspapers had carried stories about proposed plans for the acquisition of this land by the Navy. In June 1956 an agreement was entered into between Kearney Park and two of its affiliates which then owned the land and the*329 trustee of Trusts 473 and 482 wherein, in consideration for postponement of dates of payment of the notes and the advancement of certain payments the owners were obligated to make in connection with improvement bonds, the trusts were given the right to share equally with the owners in any gain realized from the purchase or condemnation of the land by the Navy. Negotiations for the purchase of the land by the Navy started about November 27, 1956, and on December 4, 1957 the June 1956 agreement was amended to define clearly the distribution that would be made of any amounts received from the sale or condemnation of the land. In substance it was provided that the proceeds of any sale should be applied to the payment of principal and interest on the notes, to reimburse the parties for payments of improvement bonds and property taxes, to reimburse the owners the amount of their investment in the land, and that the remainder would be distributed to the trusts and the owners in equal shares. It also contained a provision that if any part of the land held by either trust was not sold or condemned an undivided one-half interest would be conveyed to the trust at the time the net proceeds of*330 the sale were distributed. On February 14, 1958, the Navy accepted an offer made by representatives of the owners and of the trusts (one of whom was petitioner) to sell all of the land, with the exception of 114 acres of the 220 acres securing the $80,000 note held by Trust 473, for $1,500,000. Early in March 1958, Kearney Park and its two affiliates, as owners of the land, and the Navy signed agreements in which the owners agreed to sell and the Navy to buy the land (with the exception of the 114 acres) for $1,500,000. On March 14 or 15, 1958, petitioner entered into an agreement with Allen J. Sutherland wherein he agreed to assign to Sutherland his beneficial interests in Trusts 473 and 482 for $200,000, and on April 1, 1958, he delivered written assignments to Sutherland. The reasons given by petitioner for transferring his beneficial interests in the trusts to Sutherland were that he was concerned about an unpaid balance of $80,000 which he owed on an unsecured note for $140,000 issued on November 1, 1947; that he could not see how he could obtain funds to pay this balance on or before its due date which was April 30, 1958 "without liquidating something"; that it occurred to*331 him that he might ask Sutherland, who was president of the Security Trust and Savings Bank, to have the bank extend or renew the note, but that he liked to pay his notes when due; that he was satisfied the Navy purchase would not be closed by the time he had to pay the $80,000; that he therefore decided to "sell" his beneficial interests in Trusts 473 and 482 to Sutherland at a substantial discount; and that he figured at the time of his agreement with Sutherland that if the purchase by the Navy was consummated Sutherland's profit would be "anywhere from $13,000 to $15,000 and a sixth interest in the 114 acres of land * * * worth in excess of $300,000". Thus, petitioner would have us believe that he was willing to forego a profit of approximately $63,000 in order to raise funds to pay an $80,000 obligation that was due approximately 45 days after the Navy agreed to buy the land for $1,500,000. Petitioner's testimony is not convincing. If the objective of his transaction with Sutherland was merely to raise funds to pay the $80,000 balance due on his notes, we find it difficult to believe that a person with his demonstrated business ability would thus have disposed of his interests*332 in the trusts. The evidence clearly indicates that the payment of that amount presented no serious problem at the time he entered into the agreement with Sutherland on March 15, 1958. That payment was not due until April 30, 1958, and, although certain preliminary conditions had to be met, it appeared highly likely, in view of the Navy's acceptance on February 14, 1958, of the owners' offer to sell the land for $1,500,000, and the written agreements entered into with them early in March 1958, that he would receive his share of the net proceeds of that sale (plus a one-sixth interest in the 114 acres not purchased by the Navy) prior to April 30, 1958. Had the Sutherland agreement not been consummated, he would have received that share on April 15, 1958, 15 days before the $80,000 payment was due. Moreover, even if there had been a delay in the receipt of his share, the $80,000 payment would not have presented any serious problem, because Sutherland testified that petitioner was considered a good loan risk and if he had asked that the date of payment be extended, it would have been extended. This and other evidence convinces us that it was not petitioner's concern about the unpaid*333 balance of $80,000 on his note and the necessity of securing funds to pay it that caused him to enter into the agreement with Sutherland to sell his beneficial interests in the trusts for $200,000. It is quite apparent that what influenced him to enter into that agreement was the fact that the receipt of a substantial profit on his investment in the Kearney Park notes was imminent and that that profit would be taxable as ordinary income if received by him as a beneficiary of the trusts. He had made some computations to show what he would realize from his beneficial interests in the trusts as a result of the sale to the Navy and offered to assign those interests to Sutherland, his banker and business associate, for $225,000. He testified that he told Sutherland he figured that Sutherland "should come up with around $15,000 cash profit and an interest of one-sixth * * * in some acreage that was worth around $300,000, $325,000". Sutherland testified that he was not aware at that time that there would be any acreage left after the Navy's purchase. Nevertheless, on March 14 or 15, 1958, he agreed to pay $200,000 for petitioner's beneficial interests in the two trusts. Regardless of the*334 accuracy of petitioner's estimate of the value of the 114 acres of land the Navy did not purchase, 7 it appears that he did sell his beneficial interests at a discount because, if the sale had not been made his share of the proceeds of the sale to the Navy would have amounted to $212,809.40 and in addition he would have acquired a one-sixth undivided interest in the 114 acres which the Navy did not purchase. Obviously petitioner was not making a sale at such a discount unless he anticipated that he would benefit in some way from it, and the only way he could derive such a benefit would be in a reduction of taxes - by converting what would have been ordinary income into long-term capital gain from the sale of his beneficial interests in the trusts. We are convinced that this was his objective, and our problem is to determine whether he achieved it. *335 Petitioner contends that his beneficial interests in Trusts 473 and 482 were capital assets, and, inasmuch as he sold such interests, the gain realized was correctly reported by him as long-term capital gain. Not all gain from the sale of property is entitled to the favored treatment accorded to capital gains. In Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, the Supreme Court said (at pp. 134-135): While a capital asset is defined in sec. 117(a)(1) as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. Burnet v. Harmel, 287 U.S. 103, 106 (11 AFTR 1085). Thus the Court has held that an unexpired lease, Hort v. Commissioner, 313 U.S. 28 (25 AFTR 1207),*336 corn futures, Corn Products Co. v. Commissioner, 350 U.S. 46 (47 AFTR 1789), and oil payment rights, Commissioner v. P. G. Lake, Inc., 356 U.S. 260 (1 AFTR 2d 1394), are not capital assets even though they are concededly "property" interests in the ordinary sense. And see Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv. L. Rev. 985, 987-989 and Note 7. (Italics supplied.) In Commissioner v. P. G. Lake, Inc., 356 U.S. 260, the Court said (at pp. 265-267): The purpose of section 117 was "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." See Burnet v. Harmel, 287 U.S. 103, 106 * * *. And this exception has always been narrowly construed so as to protect the revenue against artful devices. See Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 * * *. We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. *337 The payout of these particular assigned oil payment rights could be ascertained with considerable accuracy. * * * The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property. These arrangements seem to us transparent devices. Their forms do not control. Their essence is determined not by subtleties of draftsmanship but by their total effect. * * * We have held that if one, entitled to receive at a future date interest on a bond or compensation for services, makes a grant of it by anticipatory assignment, he realizes taxable income as if he had collected the interest or received the salary and then paid it over. That is the teaching of Helvering v. Horst, 311 U.S. 112 * * * and Harrison v. Schaffner, supra; and it is applicable here. * * * "The taxpayer has equally enjoyed the fruits of his labor or investment and obtained the satisfaction of his desires whether he collects and uses the income*338 to procure those satisfactions, or whether he disposes of his right to collect it as a means of procuring them." There the taxpayer detached interest coupons from negotiable bonds and presented them as a gift to his son. The interest when paid was held taxable to the father. Here, even more clearly than there, the taxpayer is converting future income into present income. (Italics supplied.) And in Corn Products Co. v. Commissioner, 350 U.S. 46, the Court said (at pp. 51-52): * * * Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of section 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. Burnet v. Harmel, 287 U.S. 103 * * *. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by section 117 applies to transactions in property*339 which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." Burnet v. Harmel, 287 U.S. at page 106 * * *. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic Congressional purpose. This Court has always construed narrowly the term "capital assets" in section 117. * * * (Italics supplied.) In United States v. Snow, 223 F. 2d 103 (C.A. 9), a member of a partnership, who had invested $71,000 in partnership, and who had undistributed partnership earnings of $62,000 to his credit, sold his interest in partnership for $133,000. In holding that $62,000 of the $133,000 was ordinary income for income tax purposes and not a capital gain, the court (at pp. 108-109) said: It is now the overwhelming weight of authority and the law of this circuit that an interest in a partnership is*340 a capital asset. The interest of John Snow in the partnership (as contrasted with partnership earnings) was held for more than six months and therefore qualifies for capital gains treatment under Section 117 of the Internal Revenue Code. However, it is not decisive of the issue here presented to find that the subject matter properly bears the capital asset label. It is a fundamental principle of federal tax law that you must regard any ordinary income derived from an income-producing capital asset as ordinary income. Consequently, the assignment of accrued ordinary income must be treated separately from the assignment of the capital asset which produced the income. This is not an exception to the rule that capital assets held for more than six months shall be given capital gains tax treatment. It is only when a capital asset appreciates in value and is subsequently sold, beyond the six months' period, that the gain realized may be given capital gains tax treatment under Section 117 of the Internal Revenue Code. The general rule is that a right to receive ordinary income, produced by a capital asset, is not transmuted into a capital*341 asset by the sale or assignment of the capital asset together with the right to receive the ordinary income. We believe that the statutory provisions referred to above dealing with the taxation of partner's income control the disposition of this case. In addition, we see no logical reason why ordinary income from an interest in a partnership should receive different tax treatment than income from any other capital asset. (Italics supplied.) See also Fisher v. Commissioner, 209 F. 2d 513 (C.A. 6), affirming 19 T.C. 384, certiorari denied, 347 U.S. 1014, holding that taxpayer who sold notes held for more than six months for a greater sum than their face value must treat his right to ordinary income (interest due on the notes) as ordinary income and not capital gain. The foregoing decisions point the way to the correct disposition of the issue relating to petitioner's gain from his beneficial interest in the Kearney Park notes. They plainly demonstrate that if petitioner's profit from the payout of the trusts would have constituted ordinary income - and no convincing showing has been made to the contrary , his attempt to anticipate the receipt*342 of such ordinary income by the device employed herein cannot successfully transform such income into capital gain. Petitioner urges that a taxpayer may clearly do what he has the legal right to do, even for the sole purpose of reducting tax liability, and that he is not required to pursue a course which might give rise to a greater liability, if another course is open. We have no quarrel with this statement, and if the substance as well as the form of the transaction with Sutherland was a sale of a capital asset in order to realize appreciation in the value of that asset which had accrued over a period of more than six months, petitioner would be entitled to the benefit of the capital gains provisions even though the purpose of the transaction may have been to reduce taxes. But that was not the substance of that transaction. The substance of what petitioner assigned to Sutherland was the right to receive his share of the income which he and his associates as owners of the two notes held by Trusts 473 and 482 were entitled to receive as the result of the Navy's agreement to purchase the Kearney Mesa land. As already noted, had petitioner been content to receive his share of that income*343 the gain he would have realized would have been taxable as ordinary income. The assignment to Sutherland of his right to receive it did not have the effect of converting it into long-term capital gain. Cf. United States v. Snow, supra. Moreover, an even more fundamental consideration requires the classification of this gain as ordinary income. While it is true that petitioner's beneficial interest in the two tracts related directly to the Kearney Park notes, these notes were in default when acquired and were secured by deeds of trust on 360 acres of land. Plainly, the underlying land was of paramount interest in the transaction. Petitioner testified that when he acquired an interest in the notes he considered the value of the land to be substantially higher than the amounts of the notes, improvement bonds and delinquent taxes, that he was not concerned whether the owners of the land could or could not pay the notes; and that so "far as our investment was concerned we were happy to take the land, we were happy to get the money, and we were happy to join with them in the sale of the land * * *." We have already noted the wide range encompassed by petitioner's real estate*344 business, and we think that in the circumstances these notes occupied a status in relation to petitioner similar to real estate itself. He held his interest in them (whether by trust or otherwise) for the purpose of realizing a profit from their payment or from acquiring an interest in the land securing them, or both. The gain which he realized was from a transaction entered into for profit in the ordinary course of his business of dealing in real estate. It was a profit "arising from the everyday operation of [his] business". Corn Products Co. v. Commissioner, 350 U.S. 46, 52; cf. John W. Williamson, 18 T.C. 653, affirmed, 201 F. 2d 564 (C.A. 4), certiorari denied, 345 U.S. 970. In the circumstances neither his interest in the notes nor his interest in the trusts constituted a capital asset. Accordingly, for this reason as well, the gain realized is taxable as ordinary income. 8. Travel and Entertainment Expenses. The remaining issue relates to the deductions for business expenses for travel and entertainment claimed by petitioner in his returns for 1955, 1956 and 1957 in the respective amounts of $2,064.81, $1,421.49, and*345 $1,501.61. The evidence submitted by petitioner in support of his contention that these amounts constituted deductible business expenses consisted of his testimony which was not substantiated by any records. After a careful consideration of this testimony, we have applied the so-called Cohan rule ( Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2)) and made a finding that the amounts he incurred as business expenses for travel and entertainment were $1,000 for the year 1955, $500 for the year 1956, and $500 for the year 1957. These amounts will be allowed as deductions for such expenses in lieu of the amounts claimed in his returns. Decisions will be entered under Rule 50. Footnotes*. The word "allowed" was deleted and the word "disallowed" added by an official order of the Tax Court dated September 13, 1962, and signed by Judge Raum↩.1. The Court of Appeals for the Ninth Circuit said (p. 655): These facts indicate that the purpose of the organization of the corporation was to deal in real estate. Its property was to be developed as industrial property. Minor farming operations were conducted while waiting * * * for the ultimate sale which was the object of the acquisition of the property. The fact that the final sale did not occur for many years afterwards, when the Navy acquired the property, does not invalidate the conclusion of the Tax Court that the property was held for sale to customers in the ordinary course of trade. White v. Commissioner, 5 Cir., 1949, 172 F. 2d 629↩.2. Charles E. Mieg, 32 T.C. 1314↩, is not to the contrary. For comment on this case see infra, p. .3. These 14 lots included 4 lots withheld by petitioner from subdivisions in which he had been interested. And while it is true that he had developed 15 rental properties on other land similarly withheld by him which could properly be classified as "investment" property, we are not convinced by the evidence that these 4 lots, which were undeveloped, are entitled to like classification. Nor are we satisfied that the remaining 10 lots (out of the foregoing 14 lots) were held other than primarily for sale to customers in the ordinary course of petitioner's business.↩4. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.↩5. In Commissioner v. Court Holding Co., 324 U.S. 331, at p. 334, the Supreme Court said: * * * The incidence of taxation depends upon the substance of a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress.↩6. The fact that other participants in the joint venture were not in the real estate business is not controlling in respect of the gains realized by petitioner. See Rosebrook v. United States, 191 F. Supp. 356, 358-359 (D.C.N.D. Cal.): The intent and purpose of participants in a joint venture, which contemplates a sale of their respective realty interests to an ultimate purchaser * * * might be quite different one from another. For some it may be just a step in carrying on their business; for others it may be merely a single opportune investment with a view of ultimate profit but unrelated to any business of the participant, as in the case of the plaintiff here. In the absence of a true business partnership for the purpose of the transaction, which the Court finds did not exist here, the intent and purposes of the former category are not imputed to the latter category, nor does the situation of the former for tax purposes necessarily determine the situation of the latter.↩7. The Navy paid $261,500 for the 106 acres of Trust 473 land which it purchased, or $2,467 per acre. Based on what the Navy paid for the 106 acres, the remaining 114 acres that it did not purchase would have been worth $281,258, and petitioner's one-sixth interest therein (1/3 of 1//2) would have been worth about $46,876. The evidence discloses that the Trust 473 land was less desirable than the Trust 482 land, in that it was rougher and not as well located. In this connection it is not without significance that $30.25 of Internal Revenue Stamps were placed on the deed conveying a 1/2 undivided interest in the 114 acres to Trust 473. At the rate of 55 cents per the first $500 valuation and 55 cents per each additional $500 valuation ( Section 4361, I.R.C. 1954↩), this would indicate that a value of $27,500 was placed on the undivided one-half interest transferred, or $55,000 for the entire 114 acres.